# CHARLESTON

## State *v.* Taylor.

Submitted February 9, 1905.     Decided February 21, 1905.

1, Criminal Law—*Pleas—Discretion in Court.*

In a criminal case, the defendant waives his right to plead any matter in abatement by pleading in bar, but the court has discretion to allow the plea in bar to be withdrawn and the dilatory plea entered. (p. 231.)

2. Criminal Law—*Plea in Abatement.*

If, in such case, the plea of not guilty is withdrawn by leave of the court, the plea in abatement must be received, if sufficient. (p. 232.)

3. Criminal Law—*Plea in Abatement— Certainty.*

A plea in abatement in a criminal case must be certain to every intent. (p. 233.)

4. Criminal Law—*Plea.*

If the irregularity, relied upon as matter of abatement, relate to the constitution or organization of the grand jury, the plea must show in what the irregularity consists, otherwise it will be lacking in the element of certainty. (p. 233.)

5. Criminal Law—*Plea in Abatement, Insufficient.*

A plea in abatement, charging generally that no writ of *venire facias* was issued and served within the time, and in the manner prescribed by the statute, (referring to them,) and that the body of men who had professed to be the grand jury which had found the indictment did not constitute a legal grand jury, is insufficient. (p. 233.)

6. Grand Jury—*Statutory Requirements for Summoning Directory.*

The statutory requirements, respecting the time of issuing writs of *venire facias* for grand juries and the summoning of grand jurors, are directory, and substantial compliance therewith is sufficient. (p. 233.)

7. Criminal Law—*Argument of Counsel—Error.*

Comment by an attorney for the state in his argument in a felony case, upon the failure of the accused, who has testified in the case, to have his wife testify and corroborate statements of his own as to matters, said by him to be known to her, is improper; and, if objected to at the time, the refusal of the court to prohibit it and direct the jury to disregard it, is reversible error. (p. 234.)

8. Criminal Law—*Witness, Failure to Have Sworn—Error.*

If, after verdict, it is shown to the court, upon a motion for a new trial, that a witness for the state had testified, without having been sworn, and that the prisoner and his counsel had had no

knowledge of such irregularity until after the verdict was rendered, a new trial must be allowed, although the error was purely inadvertent and accidental. (p. 236.)

9. CRIMINAL LAW—*Instruction to Jury.*

An instruction, containing the clause: "The oath of a juror imposes on him no obligation where none would exist, if no oath had been administered," should be refused, though the giving of it might not be reversible error. (p. 239.)

10. CRIMINAL LAW—*Instructions.*

Instructions should be complete in themselves as far as they go, and not adopt others by mere reference. (p. 239.)

11. CRIMINAL LAW—*Self Defense—Instructions.*

When self-defense is relied upon in a case in which the evidence tends to show that the accused had provoked the combat or difficulty in which the killing was done, it is error to instruct the jury that he cannot justify his act, if he began, or brought on, the difficulty, without any intent to kill or do bodily injury. The provocation or act which induces the affray must be wrongful, not merely innocent and accidental, to bar the right of self-defense. (p. 240.)

12. CRIMINAL LAW—*Instructions—Manslaughter.*

The following instruction is erroneous, because it excludes a verdict of manslaughter: "If the jury believe from the evidence, that at the time of the alleged killing, the defendant and the deceased met, and upon sudden cause of quarrel arising between them, mutually agreed to engage in a personal combat, and did so engage in such combat, and if the jury further believe from the evidence, beyond a reasonable doubt, that during such quarrel the defendant, without the knowledge of the deceased, made use of a deadly weapon, in such a manner as would be likely to cause the death of the deceased, and did so cause it, then the defendant was guilty of murder; and if the jury further believe, from the evidence, that the defendant so used the said deadly weapon, deliberately and with malice aforethought, and with intent to take the life of the deceased, or to do him great bodily harm, then such killing would be murder in the first degree." (p. 240.)

13. CRIMINAL LAW—*Instructions—Trial Court.*

When the state of the evidence in a criminal case tends to prove facts, from which presumptions of guilt arise, under rules of evidence, established by a long and uniform course of judicial determination, the trial court may properly bring them to the attention of the jury by instructions, aptly and correctly stating them. (p. 242.)

14. INSTRUCTIONS.

Such instructions, if properly framed, neither assume the existence of the facts, from which the presumptions arise, nor interfere with the province of the jury as to the weight of the evidence. (p. 244.)

15. CRIMINAL LAW—*Instructions—Intention Presumed from Acts.*

It is improper for the court to instruct the jury that "The law is that a man shall be taken to intend that which he does, or which is the necessary consequence of his acts." Such intention is presumed, but not imputed absolutely. (p. 244.)

16. CRIMINAL LAW—*Jury to Apply Law as Given.*

In the trial of criminal cases, the jury should apply the law as given by the court, whether it be for or against the prisoner. (p. 242.)

17. CRIMINAL LAW—*Witness—Error.*

It is not error to permit a witness for the state to explain the meaning and intent of a statement made by him, which has been brought into the case by the prisoner. (p. 245.)

18. CRIMINAL LAW—*Leading Questions—Depositions.*

The trial court may properly exclude questions and answers in a deposition, when the questions, although containing the phrase "whether or not," are leading and suggestive of the answers desired and relate to facts of vital importance in the case. (p. 245.)

Error to Circuit Court, Upshur County.

Okey Taylor was convicted of murder and brings error.

*Reversed.*

R. G. LINN, R. F. KIDD, HAMILTON & MORRIS, TALBOTT & O'BRIEN, for plaintiff in error.

ROMEO H. FREER, Attorney General, and W. G. BENNETT, for defendant in error.

POFFENBARGER, JUDGE:

Okey Taylor, convicted of murder, in the circuit court of Upshur county, and sentenced to imprisonment in the penitentiary for a period of fifteen years, complains of the judgment, assigning numerous errors.

One is based upon the action of the court in rejecting a plea in abatement, setting up irregularity in the organization of the grand jury which found the indictment against him. Before this plea was tendered, the indictment had been found in Gilmer county on the 2nd day of October, 1903. On the following day, the prisoner had entered his plea of not guilty. On the 23rd day of January, 1904, he had filed his petition for a change of venue and obtained such change to Upshur county, by an order entered on the 29th day of January, 1904. On the 14th day of March, 1904, in the circuit court of Up-

shur county, the prisoner, upon leave granted, withdrew his plea of not guilty and tendered the plea in abatement, and the court, upon objection, refused to permit it to be filed, and thereupon the prisoner re-entered the plea of not guilty.

I think the plea came too late and was properly refused for that reason, but my associates are of a different opinion. They do think that, after the plea in bar had been entered, the court had discretion to refuse to allow it to be withdrawn and the plea in abatement entered, but they think that, as the court permitted the former to be withdrawn, it had not discretion thereafter to refuse to entertain the latter. All agree to the general proposition that the right to plead in abatement is waived by pleading in bar, and that, thereafter, it is in the discretion of the court to allow, or not to allow, the benefit of such plea. This Court so decided in *State* v. *Pine*, 56 W. Va. 1, (48 S. E. 206.) The courts and text-writers, in declaring the rule, generally say the court has discretion to allow the plea of not guilty to be withdrawn and the plea in abatement to be entered. 12 Cyc. 357; *Com.* v. *Scott*, 10 Grat. 749; 1 Bish. Cr. Pl. 756. The enunciation of the principle has been made for the most part in cases in which leave to withdraw has been refused. Hence, the form of expression adopted has naturally suggested itself, and should not be taken as an accurate indication of the principle upon which the courts have acted. The withdrawal of the plea in bar, and the filing of the plea in abatement, were necessary to the accomplishment of what the prisoner attempted to do. Both were in the discretion of the court and it permitted the one and refused to permit the other. The whole transaction is covered by one order and I do not think the court, by allowing the withdrawal of the plea in bar, surrendered its discretion as to the other plea. Technically, there was no defense after the plea in bar had been withdrawn. The record discloses, nevertheless, that a defense on the merits had been interposed, and the change of venue obtained, before the dilatory plea was tendered, and these facts apparent on the record justified the action of the court. The general rule is that such defenses must be interposed at the first opportunity. In some states, the plea now under consideration must be tendered at the term at which an appear-

ance to the indictment is made. *State* v. *Swafford*, 1 Lea (Tenn.) 274; *State* v. *Myer*, 10 Lea (Tenn.) 717; *State* v. *Watson*, 86 N. C. 624; *State* v. *Baldwin*, 80 N. C. 390; *State* v. *Jones*, 88 N. C. 671; *State* v. *Seahorn*, 4 Dev. (N. C.) 305. The North Carolina court, however, holds that it is in the discretion of the trial court to allow a plea in abatement after the plea in bar. The case of *Brannigan* v. *People*, 3 Utah 488, asserts the contrary of the position taken by me, holdthat, after demurrer entered and withdrawn, a plea in abatement should be admitted. In that case, however, the court reached its conclusions by a different route from that taken by my associates. In the opinion it was said: "In civil proceedings we recognize the right of the court to exercise its discretion in admitting a dilatory plea after demurrer or after a plea in bar has been filed, but in a capital case the rule is different." This position is contrary to the great weight of authority, as well as to the decisions of this Court. *State* v. *Pine*, cited; *Earl* v. *Commonwealth*, 87 Va. 589; *Reed* v. *Commonwealth*, 98 Va. 817; *United States* v. *Gale*, 109 U. S. 65; *Dixon* v. *State*, 29 Ark. 165; *Sate* v. *Lamon*, 3 Hawks (N. C.) 175; *Agnew* v. *United States*, 165 U. S. 36. "While the rights of a defendant to make his plea are perfect, he can avail himself of them only by doing it in the methods prescribed by law. Hence—as to pleas—To be entitled to show a particular matter in defense, he must tender the plea which the law has provided, in the law's form, and at the law's time." 1 Bish. Cr. Pro. 744. In *Agnew* v. *United States*, *supra*, mere lapse of time barred the plea. No plea in bar had been entered.

However, in the unanimous opinion of the court, the plea tendered was insufficient, and was properly rejected for that reason. It averred that those who appeared to have composed the grand jury "were not, nor was either of them, summoned in the manner prescribed by section 3 of chapter 157 of the Code of West Virginia; that the clerk of the said circuit court of Gilmer county did not at least thirty days before the October Term, 1903, of that court, at which the said supposed indictment was returned, as aforesaid, issue a writ of *venire facias* for sixteen grand jurors, requiring the attendance of the grand jurors on the first day of that term of the said court, or on any other day thereof, that no such

writ of *venire facias* was issued and served as provided in section 9 of chapter 116 of the said Code and that the persons empanneled for the purpose of composing a grand jury, and who did compose the body of men professing to act as a grand jury that found the said supposed indictment, did not constitute a legal Grand Jury." The plea lacks certainty. It is open to two or more constructions. It may mean that no *venire facias* at all was issued, or that, though one was issued, it did not go out thirty days before the term. Whether the objection is to the issuance or service of the writ is also uncertain for the plea says the writ was not issued and served as provided in section 9 of chapter 116 of the Code. The section referred to directs the doing of a number of things and the plea fails to indicate in what respect there was a failure of duty. It may have been some immaterial variance from the directions given by the statute. Pleas in abatement must be certain to every intent. They must set forth specifically the grounds of objection. They are not favored and are strictly construed. Hence, they must possess the highest degree of certainty in every particular. 12 Cyc. 356; *U. S.* v. *Hammond*, 2 *Woods*, 197; *O'Connell* v. *Reg.* 11 Cl. & Fin. 155; *Dolan* v. *People*, 64 N. Y. 485; *Jenkins* v. *State*, 35 Fla. 737, *McClary* v. *State*, 75 Ind. 260; Whart. Cr. Pl. & Pr. section 1427; Bishop's Cr. Pro. sections 377, 745. If, as the plea indicates, the departure from the statutory requirement was in respect to the time of the issuance of the *venire facias*, it constituted no ground for quashing the indictment. The statutory requirements, respecting the time of issuing writs of *venire facias*, are directory and substantial compliance therewith is sufficient. *State* v. *Clark*, 51 W. Va. 457; *Wash's Case*, 16 Grat. 530; *Spurgeon's Case*, 86 Va. 652,

In the progress of the trial two fatal errors occurred, for which the judgment must be reversed and a new trial allowed. One of these is the ruling of the court upon an exception taken to the action of counsel for the State in the argument of the case. The prisoner exercised the privilege of testifying in his own behalf, given by the statute. Section 19 of chapter 152, Code. The homicide occurred in a public road near the residence of the accused. As the deceased and others were approaching, the prisoner left his house and went

to, or out into, the road at the point at which the killing took place. In his testimony, he mentioned a certain statement, made by his wife at the time he left the house, which, if proved, would have tended to corroborate his evidence as to his purpose in going to the road. The wife did not testify. In the argument, one of the attorneys for the State, in discussing the evidence of the prisoner, said in substance that, if his statement, as to what his wife had said to him was correct, she should have been introduced to corroborate him, and that his failure to call her as a witness, raised a presumption against him. An exception to this reference to the failure of the wife to testify was overruled by the court. The statute expressly forbids such comment. Its language is: "The accused shall, at his or her own request (but not otherwise,) be a competent witness on such trial and examination. The wife or husband of the accused shall also, at the request of the accused, but not otherwise, be a competent witness on such trial and examination. But a failure to make such request shall not create any presumption against him or her, nor shall any reference be made to nor comment upon such failure by any one during the progress of the trial in the hearing of the jury." It is urged in the argument that, as the reference was, not to the prisoner's failure to testify, but to that of the wife, who was not charged with any offense, and related to matters introduced into the case by the testimony of the prisoner himself, the comment was not within the prohibition of the statute. The statutory terms are very broad. They permit no reference to, nor any comment upon, the faliure to make a request for permission to testify. The prohibition plainly extends to both husband and wife. After setting out specifically the request of the prisoner and the request of the accused, as to the wife or husband, it says no reference to, nor any comment upon, such failure shall be made by any one during the progress of the trial in the hearing of the jury. It expressly gives the right to the husband to testify without calling the wife and the wife cannot testify, except upon his request. Then all persons are forbidden to make any reference to his failure to make the request. No ground is perceived upon which any exception can be read into this statute.

It is designed to enforce the common law maxim, now em-

bodied in section 5 of article 3 of the Constitution, called the
Bill of Rights, which protects the citizen from being required,
in any criminal case, to be a witness against himself.   One
of the most excellent principles of the common law was that
the State took upon itself the burden of proving the guilt of
the prisoner.   It, in no manner, permitted confessions to be
extorted from him.   It was in no sense inquisitorial.   A judg-
ment could not stand upon a confession unless it was volun-
tary.   If not voluntary, confessions were not admissible in
evidence.   So the law, having brought the prisoner into
court against his will, did not permit his silence to be treated
or used as evidence against him.   Before the assistance of
counsel was allowed, prisoners were at liberty to make state-
ments to the jury, and, upon their voluntarily doing so, they
were sometimes questioned by the attorney general, but were
at liberty to stop at any time and remain silent, and, in that
event, their silence was not permitted to raise any inference
or presumption against them.   Cooley's Cons. Lim. 442 to
449.   This principle of the common law having been em-
bodied in our Constitution as a guaranty of the liberty of the
citizen, the legislature, in raising the common law privilege
from a mere statement on the part of the prisoner
in his own behalf, to the dignity of evidence under
oath, still does not, and cannot, permit the exercise of that
privilege to so operate as to compel him to testify against him-
self by conduct or otherwise.

At common law, neither husband nor wife was a compe-
tent witness in any action, suit, or proceeding, civil or crim-
inal, to which the other was a party.   See 29 Am. & Eng.
Enc. Law, 623, and the long list of authorities there cited;
*Zane* v. *Fink*, 18 W. Va. 693, (syl. pt. 8;) *Kilgore* v. *Han-
ley*, 27 W. Va. 451.   Their interests were said to be identi-
cal and the law viewed them as a single individual.   Moreover,
public policy demands the preservation of the sanctity and
harmony of the marital relation, and, therefore, forbids the
testimony of husband and wife against each other, except by
consent or when the proceeding is between them.   This prin-
ciple is somewhat relaxed by statute in this State.   Code,
chapter 130, section 22, chapter 50, section 107.   But the
provision under consideration here enforces the common law
right in criminal proceedings.   The purpose of the prohibi-

tion against any reference to the failure of the prisoner to introduce the wife as a witness in his behalf, is to prevent her silence, whether it be of her own volition, or because of the unwillingness of her husband to have her testity, from being used as evidence against him in the trial.

In view of the importance of the principle involved, and the care which has been bestowed upon its preservation, the court can not permit a violation of this statute, when the prisoner claims its benefit and bases an exception upon its violation. The courts universally hold that it is sufficient to reverse a judgment. *Long* v. *State*, 56 Ind. 182; *Baker* v. *People*, 105 Ill. 452; *Commonwealth* v. *Nichols*, 114 Mass. 285; *Commonwealth* v. *Harlow*, 110 Mass. 411; *People* v. *Tyler*, 36 Cal. 522; *Commonwealth* v. *Scott*, 123 Mass. 239; *Devries* v. *Phillips*, 63 N. C. 53; *Gregg* v. *Wagner*, 77 N. C. 246.

By inadvertence, Mrs. H. H. Hite, an eye witness to the killing, who testified, not only to what she saw, at and immediately before the homicide, but also to a certain material statement made by her husband who was also a witness, was permitted to testify, without having been sworn. This omission was not discovered until after the verdict, when it was proved and relied upon as a ground for setting it aside. Though it was purely accidental and not the result of any intentional wrong, it was sufficient cause for setting aside the verdict. An oath is a sanction which the law says shall accompany the testimony of every witness, and courts cannot be permitted to dispense with it, even by oversight. It can make no difference that the omission was an innocent mistake. Its effect is the same as if it had been otherwise The object of the oath is to bind the conscience of the witness, as well as to make his action in testifying amenable to the criminal law. Wilful violation of the truth after having taken the oath exposes him to both temporal and spiritual punishment. Moreover, the administration of it is a solemn admonition to the witness at the time he testifies, well calculated to keep alive in his mind a sense of his responsibility, both to God and to the law. If courts allow it to be dispensed with on the ground of oversight, who can tell the number of instances in which witnesses may be permitted to perpetrate

fraud upon the courts and escape legal punishment by proving to the court innocence of any intentional wrong? The courts hold the omission of the oath to be cause of reversal. *State* v. *Lowry*, 42 W. Va. 205; *State* v. *Tom*, 8 Ore. 177; *State* v. *Smith*, 78 N. C. 462; *Hawks* v. *Baker*, 6 Greenl. (Me.) 72, (19 Am. Dec. 191). In the case last cited it was shown that the witness believed himself to have been sworn, but it was held that this could make no difference.

A large number of instructions were given at the instance of the counsel for the State, all of which were excepted to. As the propriety of an instruction always depends upon the character of the issues of fact involved, and the evidence relating thereto, it is necessary to briefly set out the circumstances of the killing and indicate the character of the testimony.

Okey Taylor was charged with the murder of one Marion Furr. It seems that Furr had, a short time before the unfortunate transaction of Sunday, August 2, 1903, in which he lost his life, caused Taylor to be arrested on the charge of unlawful retailing of liquors, in consequence of which it is probable that there was bitterness between them. Taylor lived about seventy-five or one hundred yards from the public road, along which Furr, in company with his wife, both on horseback, H. H. Hite and a young lady by the name of Maggie Johns, also on horseback, and Mrs. H. H. Hite and two girls in a buggy, were passing on their return from religious service. They had been to church on the morning of that day, and afterwards dined with a friend or relative in the vicinity of the church, and then attended a funeral service at another place in the afternoon. As they were passing Taylor's place, the buggy was first in order, then came Hite and Maggie Johns, while Furr and his wife were in the rear. These persons, except the deceased, were the principal witnesses for the State. They say that, upon approaching the scene of the killing, the prisoner was seen in his yard near his house in company with other persons, but immediately arose and came out to the road and intercepted Furr and his wife at or near a pair of bars. One or more of the witnesses say that, at the time of their approach, Taylor was sitting down, while one of his companions was apparently trimming his hair. When near the road, or out in the road, he called

to Furr, asking him when he was going back to town, to which Furr replied "Whenever I get ready," or "Whenever I damned please." Taylor responded that he would not. The altercation continued and resulted in the fatal shooting. The evidence is very conflicting as to which began the use of insulting and profane language. The witnesses for the State say it was Taylor, and those for the defense say it was Furr. There is also conflict as to the exact position of the parties at the time of the actual encounter and as to what occurred. A claim made by the defense, in support of which evidence was introduced, is that Taylor's object in leaving the house was not to provoke a quarrel with Furr, but to go to a stable across the road and saddle his horse, with a view to accompanying some of the parties who were with him on a trip which they intended to take. Some say he had actually crossed the road before any violent demonstrations occurred. The evidence for the State tends to prove that the prisoner intercepted the deceased, provoked a quarrel and forced him into whatever combat there may have been, while evidence adduced for the prisoner tends to show that Taylor was crossing the road towards the stable, when Furr who had passed, turned violently upon him, threw one rock at him, which missed, and then another, which knocked him down against a bank on the upper side of the road, and then rode his horse up until he stood practically over him and lashed him with a cane or part of a riding or driving whip; and that, while in that act, Taylor told him once or twice to take the horse off of him, on failure of which, he drew his revolver and fired three or four shots at the deceased, some of which took effect and killed him almost instantly. The wife of the deceased says he endeavored to get away and that the prisoner was never down on the ground, but stood erect and deliberately fired without cause. H. H. Hite's testimony is substantially to the same effect. He says that, upon hearing the trouble, he alighted from his horse, handed the bridle to his companion and went back and asked the parties to have no trouble and that Taylor said "By God, you keep your distance and keep your mouth shut;" that the quarrel continued until Furr struck with a switch, but as to whether at the prisoner or at the horse, he is indefinite, whereupon Taylor drew his revolver and fired; that the deceased turned his

horse away, but the prisonerer fired three more shots as rapidly as possible; and that, at a distance of thirty to fifty feet from the point at which the first shot was fired, the deceased fell from his horse and died without a word.   He denies that any rocks were thrown and the tendency of his evidence is to sustain the indictment and repel the defense set up.   Mrs. Hite was further away, but she says she could see, and did see, the prisoner, at the time of the shooting, and that he was not down, but on his feet.   She says Furr's horse was between her and the prisoner, but she could see his head and the top of his shoulders just over the horse's neck.   She also says she heard her husband say, "Come, boys," or "Boys, this is no day to have trouble."    Thompson, Bell, Conrad, and others, testified in support of the defense set up by the prisoner.    There is evidence of previous threats on the part of the prisoner and of declarations of intent to kill at the time of the shooting, and also of such threats and declarations on the part of the deceased.   It is also urged in defense that there was a conspiracy between Furr and Hite against the prisoner.

Instructions No. 2, given at the instance of the state, contains this clause: "The oath of a juror imposes on him no obligation where no doubt would exist, if no oath had been administered." Though the giving of such an instruction might not be sufficient to reverse, its meaning is obscure and its subject matter most delicate in character.   It can serve no useful purpose.   The deliberations of the jury ought not to be burdened with such refinements and obscure distinctions.

Instruction No. 5 told the jury the prisoner could not justify the killing, unless he had complied with instruction No. 3, which stated the necessity of retreating before taking life, when the prisoner has provoked the combat in the progress of which the killing occurs.    That the two instructions, read together, correctly state the law cannot be doubted, but instruction No. 5 should not have been given in that form. An instruction ought to be complete in itself without reference to others, though it need not cover the whole case.   It is bad practice, though not necessarily reversible error.    Instructions Nos. 13 and 15 are open to a similar objection.   Both refer to justifiable shooting "as explained in these instructions."   They required the jury to define the terms "justifi-

able cause," "legal cause" and "justifiable shooting" and then find instructions, among those given, which would come within the definitions. No doubt the jurors had capacity to do this, but their deliberations should not be burdened with such work. Instructions ought to be clear, accurate, concise and comprehensive statements of the law applicable to the facts. *Mosher* v. *Kitchel*, 87 Ill. 19; *Loeb* v. *Weis*, 64 Ind. 285: *State* v. *Mix*, 15 Mo. 153.

Instruction No. 6, which told the jury the defendant could not justify the killing if he had brought on or begun the difficulty, although with no intent to kill or do bodily injury to the deceased, should have been refused. A man does not lose his right of self-defense unless he has done some wrongful act. Mere innocent or accidental cause of difficulty or combat, permitted by this instruction, is not enough. 1 Hawk. P. C. 82; Hor. & Thomp. Self-Def. 220; 25 Am. & Eng. Ency. 268; *Foutch* v. *State*, 95 Tenn. 711; *Fussell* v. *State*, 94 Ga. 78.

Instruction No. 17 reads as follows: "If the jury believe from the evidence, that at the time of the alleged killing, the defendant and the deceased met, and upon a sudden cause of quarrel arising between them, mutually agreed to engage in a personal combat, and did so engage in such combat, and if the jury further believe from the evidence, beyond a reasonable doubt, that during such quarrel the defendant, without the knowledge of the deceased, made use of a deadly weapon, in such manner as would be likely to cause the death of the deceased, and did so cause it, then the defendant was guilty of murder; and if the jury further believe, from the evidence, that the defendant so used the said deadly weapon, deliberately and with malice aforethought, and with intent to take the life of the deceased, or to do him great bodily harm, then such killing would be murder in the first degree." The first proposition embodied in it is incorrect. The mere making use of a deadly weapon, under the circumstances, does not necessarily constitute second degree murder. That crime is unintentional malicious killing. *State* v. *Morrison*, 49 W. Va. 210. Unlawful cutting with intent, not to kill, but only to injure, resulting in death, would constitute the crime. But the facts assumed in the hypothesis, put by the first clause of the instruction, do not preclude the jury from finding that

the shooting was done in hot-blood, and, therefore, consti-
tuted only manslaughter. *State* v. *Scott*, 36 W, Va. 704;
*State* v. *Hildreth*, 9 Ire. (N. C.) 429, (51 Am. Dec. 364,)
holding that "Where two persons engage in sudden com-
bat, and after they become heated thereby, one of them
seizes a deadly weapon, or uses one in his hands, having no
intention to use it when the combat commenced, and slays his
adversary, his offense is manslaughter only." *State* v. *Mazon*.
90 N. C. 683. That a deadly weapon was used, under such
circumstances without the knowledge of the deceased, is not
conclusive. "The mere possession of a deadly weapon when
the combat began, however, is not sufficient to show an in-
tent to take an unfair advantage by using it in the fight. If
the accused did not intend to use the weapon when the fight
began, but used it in the heat of passion aroused by the fight,
the killing is only manslaughter." 21 Am. & Eng. Ency.
185. It is a question of intent to be determined by the jury
from all the facts and evidence in the case. If there was a
fixed purpose to do bodily harm, without killing, and death
resulted, it was murder of the second degree. If there was a
sudden, impulsive killing, due to passion suddenly aroused,
*furor brevis*, it was manslaughter, although there was intent
to kill. If there was a fixed, deliberate and sedate purpose
to kill, usually termed specific intent to take life, wilful, de-
liberate and premeditated, although in the course of mutual
combat, as stated in the latter part of the instruction, the of-
fense was murder in the first degree. Of these three offenses,
any one of which the jury might have found from the evi-
dence, the instruction excluded one, namely, manslaughter,
to the prejudice and injury of the prisoner, by virtually bind-
ing the jury to find that the offense was either murder of the
first degree or murder of the second degree. Had the in-
struction presented the three possible results instead of two,
it might not have made any difference in the verdict, but there
is no way by which that can be known. The prisoner was enti-
tled to have all three propositions considered by the jury, and it
is presumed that he was injured by the error. *State* v. *Doug-
lass*, 28 W. Va. 297; 12 Cyc. 913. The error, therefore,
calls for reversal of the judgment and a new trial.

Omission of an essential clause or qualification from in-
struction No. 26 makes it erroneous. By it the jury were

told that, if there was mutual combat between the parties, or a difficulty, wilfully incurred by the prisoner, he could not be acquitted, "no matter how violent his passion became, or how hard he was pressed, or how imminent his peril became during the progress of the affray." It was a binding instruction, omitting to say, unless the prisoner declined further combat, and retreated. If the accused, having provoked the difficulty, declines further combat and withdraws, he may justify the killing, although originally in fault. *State* v. *Cain*, 20 W. Va. 679; *Vaiden's Case*, 12 Grat. 729; *State* v. *Evans*, 33 W. Va. 417.

Several instructions are excepted to because they declare the usual presumption of guilt arising from facts established, such as that a killing, without any, or upon slight, provocation, with a deadly weapon, unexplained, is presumed to be murder of the first degree, and that a man is presumed to intend that which he does or which is the probable result of his acts, and we are asked to overrule numerous cases in which this practice has been approved. In this connection, it is urged that the trial court, in requiring the jury to apply these rules, trespasses upon its province, because, first, in every such instance, material and controlling facts are assumed to the prejudice of the prisoner, and, second, because such instructions bear upon the weight of the evidence.

Both of these positions are clearly untenable and wholly unsupported by any authority. The propriety of an instruction always depends upon the evidence in the case. No proposition of law can be announced to the jury as applicable to a case, unless there is evidence tending to support every fact that must be found by the jury in order to make it applicable. A proper instruction never assumes the existence of facts, but it does assume that there is in the case evidence of certain facts. As the facts are generally disputed, the evidence of the plaintiff tends to prove one set, relevant and material to the issue, and that of the defendant another, and it sometimes happens that there are several issues so that the contentions as to facts, supported by evidence, are numerous, giving scope for several instructions, embodying different propositions of law. When the jury have ascertained the facts, they apply that principle of law which the court

has said is applicable to them, if found. So long as the court confines its statements of the law to principles, the application of which is called for by facts which the jury may find from the evidence, without saying, or in any way, indicating an opinion, that they have been proved, there is no ground for the charge that the existence of any fact has been assumed. The objection sustained in *State* v. *Dickey*, 46 W. Va. 319, cannot avail here. The state of the evidence is entirely different. In that case, the Court were of the opinion that the fact of great provocation was admitted, or at least incontrovertibly established, which made the action of the court in submitting it to the jury erroneous. That case asserts the exact opposite of what is here contended for. This Court said the trial court had done wrong in not accepting as true a certain fact, not that it had erred in assuming the existence of that fact.

We think it equally apparent that the statement of these rules of evidence do not affect the weight of the evidence. In every instance they are hypothetical statements or are founded upon admitted facts, such as that the prisoner killed the deceased with a deadly weapon, without any, or upon slight, provocation. Is it to be supposed that a jury is so utterly ignorant as not to be able to see which, if any, of the facts, constituting the offense described, are in controversy, and that the application of the principle depends upon their findings as to facts? If the facts are not controverted, there can be no possible impropriety in stating the law applicable to them, because there is nothing to try. The law is for the court, the facts only for the jury. When killing by the prisoner is shown, a *prima facie* case of guilt is made out by the state. What possible harm can there be in saying so to the jury? How can it be said the instruction is an expression of opinion as to the weight of the evidence? Up to this point there is no conflict in the evidence, and, hence, no function of weighing to be performed, for a verdict contrary to the case so made would be palpably wrong. What constitutes an offense is matter of law, and if the facts in the concrete case, up to a certain point, be admitted. or be not in controversy, the court may, without the slightest impropriety, tell the jury what their verdict should be, if the case is not altered by evidence adduced to establish additional facts, calling for dif-

ferent law. Such *prima facie* case compels the prisoner to overthrow it by showing additional facts or circumstances which justify the act or mitigate the offense. These are left to the ascertaiment of the jury. They are hypothetically stated, and the action of the jury upon the evidence relating to them, is wholly uninfluenced by instructions, stating the presumption arising from uncontroverted facts. Whether these presumptions be regarded as matters of law or fact cannot affect the question under consideration. Even if presumptious of fact only, they are important elements of evidence which can be affirmatively and authoritively brought to the attention of the jury only by the action of the court. How else can they be proved? What document other than a law book will prove them? What witness can swear to them? Must they be brought into the case by the mental operations and knowledge of the jurors only, unaided by rules and principles born of centuries of experience? Most assuredly not. Obviously the court may properly direct attention to them. Viewed in this light the court says no more than that they are evidence, an assertion which is indisputably true. The jury are neither told that they prove the whole case against the prisoner nor that they are entitled to any fixed amount of weight as against other evidence. What amount of evidence to the contrary will overcome such presumption is always left to the jury, but there must be some. If, on the other hand, they are presumptions of law, the right of the court to embody them in instructions to the jury can be denied only on the theory that in criminal cases the law, as well as the facts, is for the jury. Against this view, stand the great weight of authority and the decisions of this Court. *State* v. *Dickey*, 48 W. Va. 325; *State* v. *Prater*, 52 W. Va. 132. Juries have the power arbitrarily to decide in favor of the prisoner contrary to the law, because the State has no right of appeal, but that by no means argues their right to do so.

Instruction No. 11 reads as follows: "The rule of law is that a man shall be taken to intend that which he does, or which is the necessary consequence of his act." This was condemned in *State* v. *Sheppard*, 49 W. Va. 582. Such intention is not absolutely imputed by the law. It is only presumed and the presumption may be overcome. Instructions

should state the law accurately to avoid danger of misleading the jury. Other instructions given, read with this one, may explain its meaning by showing it to be different from what its words import, but that only makes its defect the more apparent. A bad instruction is not cured by giving a good one. *McKelvey* v. *Railway Co.*, 35 W. Va. 500; *Parkersburg Industrial Co.* v. *Schultz*, 43 W. Va. 470. This error might not be sufficient to reverse, but such an instruction ought not to be given.

The action of the court in permitting Mrs. Furr to testify as to the meaning of a certain statement, made by her to Hite, on the morning of the day following the homicide, is excepted to. Of this, the prisoner cannot be heard to complain, because that conversation was by him introduced for the purpose of affecting the evidence of Hite. He cannot bring it into the case for one purpose and put it out for all others, nor can he have the benefit of it except in the form in which it actually occurred, and according to its meaning and intent.

Another assignment of error is based upon the action of the court, in excluding three questions and the answers thereto, in the deposition of Clara Beall, taken on behalf of the accused. They were as follows:

"Q. Did you hear Okey Taylor, after he had been knocked down by Furr, ask Furr to take his horse off of him?

A. I did.

Q. State whether or not before Taylor was knocked down, Furr turned his horse and came back towards him?

A. He did.

Q. State whether or not at the time of this trouble, Okey Taylor was near a pair of bars?

A. He was."

The depositions showed objection to them at the time of the taking thereof, because of the form in which the questions were propounded. A question, containing the words, "whether or not, so as, in most instances, to prevent the use of the words "yes" or "no," in answer, is said to be, ordinarily, not leading. *State* v. *Henderson*, 29 W. Va. 147; *Wills* v. *Quimby*, 31 N. H. 485, 490. Whether it is or not depends upon the nature of the question, the subject matter

and the particular manner in which other parts of it are framed  *Bartlett* v. *Hoyt*, 33 N. H. 151; *People* v. *Mather*, 4 Wend. (N. Y.) 229.  The witness to whom these questions were propounded saw the killing and all she knew could have been brought out without suggestion in any form.   The subjects of the questions were vital facts in the case, and the questions were so framed as to enable her to see and know, in view of her familiarity with the case, what answer would best subserve the purpose of the defense.  Every one of them could have been answered by "yes" or "no".  We think the ruling of the court was proper.

For the reasons above given, the verdict ought to have been set aside and a new trial allowed.   Therefore the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed.*

BRANNON, PRESIDENT:

I do not think instruction 6 bad.   No innocent or accidental cause of incitement to combat is suggested by the evidence. I see no fault in No. 11.