JAMES F. DUNBAR v. WILLIAM McGILL.

[See 64 Mich. 676.]

*Trover and conversion—Evidence—Res gestæ—Reading testimony of witness residing out of State given on former trial—Impeachment of witness.*

1. Where the conversion of property is sought to be established by proof of the defendant's *acts*, his *words* accompaning such *acts* are as much a part of the *res gestæ* as his *acts*, and are admissible in evidence.

2. The testimony of a witness taken on the trial of a cause may be read in evidence on a subsequent trial if he is shown to reside beyond the jurisdiction of the court.

3. Where a witness, on cross-examination, is questioned in regard to his testimony on a former trial, after which a *portion* of such testimony is read, it is error to exclude the reading of the *balance* of the testimony by the opposite counsel.

Error to Cass. (Smith, J.)   Argued January 19, 1888. Decided April 13, 1888.

Trover. Defendant brings error. Reversed. The facts are stated in the opinion.

*Howell & Carr,* for appellant.

*Harsen D. Smith,* for plaintiff.

CHAMPLIN, J. We granted a new trial in this case at the January term, 1887. See 64 Mich. 676 (31 N. W. Rep. 578).

The case has been again tried, and has resulted in another verdict and judgment for the plaintiff.

Error is assigned upon the charge of the court, and upon refusals to charge as requested by the defendant's counsel. We discover no error in the charge of the court, nor in his refusal to give the defendant's requests. So far as pertinent or proper they were covered by the charge as given.

Error is also assigned upon the rulings of the court made upon the trial. The first three errors assigned we regard as unimportant. They were not supported by exceptions, and need not be noticed.

The fourth error assigned is as follows:

" The circuit judge erred in refusing to permit the witness Henry Shanafelt to answer the question, ' What did he say to you?' put to him on cross-examination, and in his remarks and comments upon the question."

There does not appear to have been exception to either the refusal of the court impliedly made, or to his remarks.

The fifth assignment is based upon what appears in the record upon the cross-examination of the witness Shanafelt, as follows:

" *Q.* State that conversation." Objected to as calling for the declaration of defendant. Defendant's counsel then stated, " We offer it, not for the purpose of getting the declarations of McGill, but for the purpose of indicating which way he came from, and where he had been that morning."

Plaintiff's theory was, and his testimony tended to prove,

that defendant was engaged in driving sheep along a certain road which passed the witness Shanafelt's house; that he had in his employ several different persons assisting to collect sheep of defendant from different farms in the vicinity, and drive them to the place of destination; that he had arranged with a farmer by the name of Quick to keep certain of his sheep over night in his fields, which lay west from Shanafelt's, upon the road leading to Cassopolis; that a small flock, driven by one Gray, reached Quick's about dark, and, before they were turned into the field, a stray flock of sheep, consisting of about 30, which were in the highway, became, without fault of defendant, intermingled with his; that, it being too dark to separate them that night, they were all turned into the field together, with the intention of separating them the next morning; that defendant then notified the neighbors along that highway that stray sheep had become mingled with his, and endeavored to find the owner. He called at Shanafelt's, and inquired of him, and told Shanafelt that he would call again the next morning, and ascertain whether his had strayed from his fields.

It was the theory of the plaintiff that defendant on the next morning, between the hours of 7 and 9, took with him a boy named Brown, who had been employed to assist in driving his sheep, and drove in a buggy west, past Shanafelt's, to the field, where defendant, with this boy's assistance, assorted out the stray sheep, and drove them across two fields to the county fair-grounds, near Cassopolis, and put them in the fair-grounds; that then they drove in the buggy back east, past Shanafelt's, to a point near the school-house, where defendant directed him where to go to assist in collecting more sheep, and he went in one direction and defendant in another; that, a few days after, defendant went to the fair-grounds, and took and drove away the sheep, and that these sheep were the plaintiff's. And he introduced evidence which tended to prove this theory.

The witness Brown, the boy referred to, had testified upon a former trial that, on the morning after the sheep were turned into Quick's field, defendant and he left Hale's at about half-past 7 o'clock, and drove to the field where the sheep were; and on the way defendant stopped and talked with a man, about a minute, not far from the crossing. This must have been Shanafelt, as he lives nearest the crossing. They were driving west.

That they then drove to the field, and assorted out a flock, and took them over through a couple of fields, and into a field with a high board fence around, which he had since learned was the fair-grounds; that they then went back in the buggy, past Shanafelt's, to the school-house, where they parted, he going in one direction to assist in collecting and driving sheep, and defendant in another. He does not testify to stopping at Shanafelt's on the way back east.

Plaintiff's witness Fox had testified to defendant's coming to his house that morning between 9 and 10 o'clock somewhere, as near as he could tell.

It was a disputed question as to what time defendant arrived in the neighborhood where the sheep had been kept over night, and, as bearing upon the conversion claimed, it became material. Shanafelt had been twice sworn for plaintiff in the case before the present trial, and had testified without hesitation that on the morning in question, when he saw defendant and the boy, and talked with defendant, he came from the east. On this trial he was undecided as to which way defendant came from. He had been thinking it over, and thought he was mistaken in his former testimony, and he now thought that defendant came from the west that morning. He was not real positive, and his recollection still was that they came from the east. He placed the time as about 8 o'clock, and could not have been later than 9. He testified that the boy who was with him that morning was not the one who was with him the night before.

On cross-examination he was asked if defendant notified him, when he came, that he had been down where the sheep were, and he replied that he did not. He was then asked:

"What did he say to you?" whereupon the following colloquy occurred, as appears by the record:

"*Mr. Smith.* Would that be proper?

"*Q.* Did you have any conversation with him that morning?

"*A.* Very little,—just a few words.

"*Mr. Smith.* I don't see how it would be proper.

"*Howell.* I think we can show it for the purpose of fixing time.

"*Court.* I never knew any court to hold that the declaration of your own client can be introduced in his own behalf, for the purpose of showing time. You want to show by this man that he did not do what he is accused of.

"*Question by Howell.* State that conversation.

"*Smith.* Objected to as calling for the declarations of the defendant.

"*Howell.* We offer it, not for the purpose of getting the declarations of McGill, but for the purpose of indicating which way he came from, and where he had been that morning."

The court sustained the objection, and excluded the testimony.

The testimony should have been received. The plaintiff was endeavoring to prove a conversion of the sheep by the defendant by proving his acts. These acts were shown from the time he left Hale's that morning until he put the sheep in the fair-grounds. His words accompanying these acts were as much part of the *res gestæ* as his acts. The act of placing the sheep in the fair-grounds was not of itself a conversion. That depended upon whether that act was done to convert the sheep to his own use. If it was done simply as a means of keeping the sheep from mingling with his own, with no intention of converting them to his own use, it would not be a conversion. It would be evidence, with other

circumstances, to be submitted to the jury, from which they could infer an intention to convert them to his own use. His conversation with Shanafelt might have explained his acts, and might have repelled the inference which the jury' would have been warranted in drawing from his acts alone. The conversation should have been received for the jury to consider with the other testimony.

The plaintiff had laid the foundation for this testimony by showing by Shanafelt and the witness Gray, that defendant was to call again the next morning to ascertain further whether the sheep were Shanafelt's or not. The next morning they bring him back to Shanafelt's, at a certain hour, but will not let the witness state the conversation which then occurred between them. It was proper cross-examination, as well as admissible as part of the *res gestæ*. The reason stated by Mr. Howell is evidently based upon its admissibility as a part of the *res gestæ*.

The witness Brown was sworn, examined, and cross-examined upon a former trial of this case. He was a non-resident of the State, and at the time of the trial he resided in Indiana, and was absent from the jurisdiction, and beyond reach of subpœna. His attendance could not be compelled. His testimony given upon the former trial was properly received in evidence. *Howard v. Patrick,* 38 Mich. 795; *Stewart v. Bank,* 43 Id. 257 (5 N. W. Rep. 302); *Labar v. Crane,* 56 Id. 585 (23 N. W. Rep. 323). His testimony had been taken down by a stenographer, and no question was made as to its having been correctly and accurately taken and transcribed.

The defendant was introduced as a witness in his own behalf. He narrated where he found the sheep driven by Gray on the evening testified to by him; that he was south of the corners called " Mosher's Corners;" that it was nearly dark; that his sheep were marked with blue chalk, and it was too dark to see the chalk-marks; that he took Gray into

his buggy, and drove through his flock so as to turn them back; that they were frightened, and ran some, but they got ahead of them, and Gray got out, and he drove back to the four corners to turn them back to Quick's; that, when at the corners, he noticed some sheep run from the opposite corner of the road, and mix with his sheep; that it was too dark to distinguish, but he thought they were strange sheep, and so told Gray, and notified the neighbors. He gave a circumstantial account of his whereabouts the next morning. Denied going to the field with Brown; stated where he had stopped at different farms, and assorted out sheep; and that he got to Cassopolis between 10 and 11, where he got some salt, and got a Mr. George to go with him to Quick's field, as he expected to have to assort out the strange sheep; that he got up there about half-past 10 A. M. He was asked by counsel on cross-examination:

"Q. Didn't you swear on the first trial that you got to Cassopolis not far from nine o'clock?

"A. I think not, sir; I couldn't have got there by that time.

"Q. If you swore to that on the first trial, it was not true?

"A. I think I didn't swear to it.

"Q. Are you positive you didn't swear to it?

"A. I wouldn't say, but I don't think I swore to that."

In order to impeach the witness, counsel for plaintiff introduced the transcript of the reporter's notes, which were conceded to be correct, of the testimony of defendant given upon the first trial of the case, and read therefrom the testimony of witness as to the time he was at Shanafelt's the next morning; also from his testimony upon the same subject given upon the second trial. He further read from such testimony given on the first trial as follows:

"Q. What time did you leave Northrup's that morning?

"A. I should think it was seven o'clock,—may have been a little after seven.

" *Q.* What time did you get to Cassopolis?
" *A.* I should think not far from nine o'clock."

Defendant's counsel then said that he desired to read the balance of McGill's testimony, on the first trial, upon the subject of the 9 o'clock contradiction, and proceeded to read, from the same transcript, a consecutive portion of the cross-examination of defendant from which counsel for plaintiff read, as follows:

" *Q.* Then the next morning you went where ?
" *A.* To Mr. Hale's.
" *Q.* From there to Cassopolis?
" *A.* No, sir ; from there to widow Norton's.
" *Q.* What time did you leave Northrop's that morning?
" *A.* I should think it was seven o'clock,—may have been a little after seven.
" *Q.* What time did you get to Cassopolis?
" *A.* I should think not far from nine o'clock.
" *Q.* What time did you get up in the Quick neighborhood?
" *A.* I think about half-past ten.
" *Q.* You will swear positively that you didn't get up there before 10 o'clock, won't you?
" *A.* Yes, I don't think I did before ten; I think it was after ten.
" *Q.* Wasn't you along there by Shanafelt's about 7 o'clock the next morning?
" *A.* No, sir.
" *Q.* Did you hear his testimony?
" *A.* Yes, sir, I did; but he is mistaken.
" *Q.* Fox is mistaken, and the boy is mistaken; were you ever mistaken?
" *A.* I have been, yes, sir."

After the two first questions and answers were read, the counsel for plaintiff objected to the further reading of said testimony, without stating any reason therefor; and the court sustained the objection, and declined to allow the balance to be read in evidence.

This was clearly error. The purpose of plaintiff in introducing the deposition was to impeach the defendant as a witness in his own behalf. As before stated, the material

question was at what time defendant arrived at Quick's field on the morning referred to. He had stated it was after 10, and nearly or quite 11. The time he arrived at Cassopolis had no bearing upon the case, except as it was connected with the way he went, and the time he arrived that day in the neighborhood of where the sheep were herded. And the time he arrived at Quick's neighborhood, as shown in the portion of the deposition excluded, might have aided the jury in reconciling the discrepancy as to his statements of the time he arrived at Cassopolis. The cross-examination of this witness as to what he had sworn to on a former trial was irregular, and unfair to the witness (as was plainly pointed out in *Lightfoot v. People*, 16 Mich. 507), and would or should have been excluded had objection been made.

It was there said:

" It would be unfair to cross-examine, until the jury are informed of the precise contents of the deposition, and thus warned against assuming contradictions which do not really exist; and it would also be unfair to the witness, because he may have explanations which would not occur to him until his memory had been refreshed by hearing the paper read."

It cannot be possible that the plaintiff, by his irregular method of cross-examination, has gained a better position than he would had he proceeded regularly. He need not have cross-examined at all; but, when he introduced the depositions of the witness taken upon a former trial, the whole would have been before the jury, and the defendant could have read in evidence such parts as he claimed tended in any way to reconcile his testimony.

Mr. Best, in his work on Evidence (section 520, Morgan's ed.), says in speaking of exceptions to the rule excluding self-serving evidence:

" The first is that, where a part of a document or statement is used as self-disserving evidence against a party, he has a right to have the whole of it laid before the jury, who

may then consider, and attach what weight they see fit to any self-serving statements it contains."

The defendant's defense rested in a great measure upon the credit the jury should give to his own testimony. He was sought to be impeached both by showing that he had made contradictory statements under oath, and by impeaching his reputation for truth and veracity. Six witnesses swore they would not believe him under oath, and six swore they would believe him under oath. The testimony excluded, so far as it tended by fact or inference to explain or throw light upon the contradictions in his testimony given on the various trials, was material error.

It may be remarked that he does not stand alone in giving testimony upon this trial discrepant from that given upon former trials. Some of the plaintiff's witnesses changed their testimony in material respects; and we can see that it might have been of service to the jury to have received instructions from the court respecting rules for their guidance in such cases, or where witnesses are sought to be impeached.

We entertain no opinion upon the merits. The case is a peculiar one in some of its features, and we should not have sent it back for another trial were we not satisfied that the error pointed out was prejudicial to the defendant's case.

The judgment is reversed, and new trial ordered.

SHERWOOD, C. J., MORSE and LONG, JJ., concurred.