# CHARLESTON.

## STATE v. DAVID SNIDER.

Submitted January 15, 1918.　Decided January 22, 1918.

1. WITNESSES—*Cross-Examination—Impeachment.*

   The test of the right to elicit from a witness, on his cross-examination, a matter not referred to in the direct examination, as a foundation for impeachment 'of the witness, by proof of a contradictory or inconsistent statement made by him, is whether the party cross-examining could prove such matter as a part of his case by the same witness. (p. 526).

2. SAME—*Impeachment—Contradictory Statement — Cross-Examination.*

   ·The declaration by a witness in a trial on an indictment charging murder, of his mere opinion that the deceased would kill the accused, made a few weeks before the homicide, is not inconsistent with his denial in evidence of personal knowledge of difficulties between the parties referred to in the declaration, nor admissible on cross-examination, as matter constituting ground of impeachment by contradiction. (p. 526).

3. CRIMINAL LAW—*"Confessions"—Voluntary Character.*

   An extra-judicial admission of a person on trial on an indictment charging him with murder, of a mere incident of the occasion of the homicide, not inconsistent with his innocence of the crime charged, is not an admission or confession of guilt, falling under the rule requiring the elements of freedom and voluntairness of expression. (p. 526).

4. SAME—*Instructions—Particular Instructions.*

   If the instructions given in a trial, read and considered as a whole, correctly state the law applicable to the case, mere incompleteness of some of them and verbal inaccuracies in others, fully supplied and corrected by those in connection with which they are read, do not vitiate the instructions as a whole, nor do the merely formal defects mentioned legally condemn the separate instructions in which they are found. (p. 527).

5. SAME—*Appeal—Invited Error.*

   A prisoner on trial in a criminal case cannot be ·heard to complain of mere errors in procedure, not violative of any constitutional guaranty, that he has induced or caused. (p. 528).

6. SAME—*Objection—Unnecessary Repetition of Instructions.*

   Unnecessary repetitions of instructions pertaining. to a single

subject, given at the instance of both parties to a trial, constitute no available ground of complaint against the verdict. (p. 528).

7. Homicide—*Self-Defense—Words or Threats.*

Mere words or threats unaccompanied by an overt act do not constitute ground of justification or excuse of a homicide, under the law of self-defense, and an instruction treating them as such is properly refused. (p. 529).

8. Same—*Concurring Injuries—Effect.*

If, after a mortal wound has been inflicted upon a person and while he is still living, a second injury is inflicted upon him, and he subsequently dies from the effects of both, the first one contributing to the death, the perpetrator of the first injurious act is not exonerated from the charge of homicide, by the perpetration of the second. (p. 529).

9. Same—*Intervening Injury—Proximate Cause.*

To effect such exoneration the intervening injury must have been the proximate cause of the death. (p: 529).

10. Same—*Trial—Misleading Instructions.*

Instructions which, if given in such case, would advise the jury that the mere hastening or acceleration of the death by the intervening act, are misleading, wherefore it is proper to refuse to give them. (p. 529).

11. Criminal Law—*Presence of Accused—Presumption.*

If the record of a criminal trial shows retirement of the judge, the attorneys and a witness, from the court room, in which the trial was conducted, and is silent as to whether they were accompanied by the accused, the legal presumption is that they were not and that he remained in the court room. (p. 530.)

12. Same—*Presence of Accused—New Trial.*

If, in the progress of the trial of a felony case, the judge and the attorneys retire from the court room in which the trial is conducted, to an ante-room, leaving the accused and the jury in the court room, and, in such ante-room and in the absence of the accused, an objection to the introduction of evidence is argued by the attorneys and passed upon by the judge, the accused is entitled to a new trial, by reason of deprivation of his legal right to be personally present at every stage of his trial. A like result flows from such retirement by the judge, attorneys and a witness and interrogation of the witness, in the absence of the accused, after an objection to a question propounded to him has been sustained in the presence of the accused. (p. 530).

(Ritz, Judge, absent).

Error to Circuit Court, Mercer County.

David Snider was convicted of murder in the second degree, and he brings error.

*Reversed and remanded.*

*John M. McGrath, A. M. Sulton, Ajax T. Smith,* and *Jno. R. Pendleton,* for plaintiff in error.

*E. T. England,* Attorney General, *Sanders & Crockett,* and *Hartley Sanders,* for the State.

POFFENBARGER, PRESIDENT:

David Snider complains of a judgment of the Criminal Court of Mercer County, imposing upon him a sentence of imprisonment in the penitentiary for a term of twelve years, he having been convicted of murder in the second degree, upon an indictment charging him with the murder of W. P. Ball, his neighbor. One assignment of error is founded upon the rejection of evidence tendered for impeachment of a witness; another upon admitted evidence of admissions by the accused; two upon certain transactions and proceedings had outside of the court room and in an ante-room, in the absence of the accused, he and the jury remaining in the court room at the times of the occurrences in question; five upon the giving of instructions at the instance of the state; three upon the refusal of certain instructions requested by the accused; and another upon the overruling of a motion for a new trial.

Evidence adduced in the trial tends to prove the shooting was the culmination of a series of quarrels between Snider and Ball, covering a period of several years and growing out of their trading with one another, trespasses of Snider's stock upon Ball's premises and alleged mistreatment and abuse of the stock. The parties to the unfortunate occurrence were owners of adjacent properties. Snider's barn stood near his house and was separated from Ball's land by a narrow lane and a division fence. From a latticed window or door on the second floor of the barn, Snider shot Ball with a thirty-eight caliber pistol, while the latter was on his own land, beyond the lane and the fence, and engaged in driv-

ing one of Snider's hogs from his premises. The accused denied having armed himself for the purpose of an attack upon Ball and endeavored to justify or excuse the shooting on the ground of self-defence. He claims to have been aroused from his sleep, on the morning of the shooting, Sunday, July 16, 1916, by the report of a gun in the neighborhood of his residence, which he suspected Ball had fired in the infliction of further injuries upon some of his stock, and to have armed himself for the purpose of protecting it from pursuit and injury by Ball's dog. Going to the barn, he saw nothing of the dog, but did see Ball in his own field and near his own residence. Later, he went into the barn loft, to throw down some feed, he claims, and, while there, Ball came near the barn and endeavored to·throw a rock at him, whereupon he fired one shot to frighten or deter him, and, this purpose failing and Ball still endeavoring to throw the rock, he fired a second time, aiming at his legs. The ball took effect in Ball's back and he fell. This story is squarely contradicted by an alleged eye-witness, one Kessinger, an employee of Ball, who says he saw the occurrence from a window of Ball's residence. According to his statement, Ball was driving Snider's hog from his potatoe patch, without violence, when he was fired upon, from the latticed window of the barn, without warning and while his back was turned toward the barn. After the shooting, he was removed to a hospital and an exploratory examination made by a surgeon. Finding the ball had not entered the abdominal cavity, but that the appendix was diseased, the surgeon removed it, and then closed the incision he had made. Before the operation, there was nothing alarming in the patient's condition. His pulse, temperature and respiration were deemed to be about normal. The next day, a radical and alarming change suddenly took place, and he died. The surgeon removed the appendix upon his own judgment and responsibility, neither the patient nor any member of his family having requested him to do so. Nor was this act deemed or considered treatment of the gunshot wound. It was merely a precaution against the necessity of a future surgical operation for relief from appendicitis.

The subject matter of the rejected testimony was a statement of Zeb Ball, son of the deceased, alleged to have been made to one John W. Wiatt, less than two months before the shooting, to the effect that his father had recently had trouble with Snider and intended to kill him. On his cross-examination, Zeb Ball had admitted that he had heard of trouble between his father and Snider, but denied that he had ever witnessed any altercation or other trouble between them. In his testimony in chief, he had said nothing about their relations, and what he said on that subject was brought out by the cross-examination. The statement imputed to him by Wiatt did not purport to be the repetition of any declaration made by the deceased. Wiatt distinctly says he did not say his father had said he would kill Snider. If the declaration could be deemed in any sense a threat, there is no evidence that it was ever communicated to the accused, or that he had any knowledge of it. Admissibility thereof as evidence of a threat is not claimed. The only ground assigned for its admission is the right of impeachment of the witness Ball. The statement does not purport to be anything more than a declaration of his opinion that his father would kill Snider, wherefore it is not inconsistent with what he had said, on cross-examination, respecting his personal knowledge of their previous relations. He admitted he had heard that they had had trouble and his opinion may have been founded upon that incident and his knowledge of his father's character. Obviously, it could not have been introduced as a part of the defendant's case, and whether it could or not is the test of the right to bring it out on cross-examination, as a foundation for impeachment. *Peterson* v. *Paint Creek Colliery Co.,* 71 W. Va. 334, 341; *State* v. *Goodwin,* 32 W. Va. 177.

The admitted evidence of which complaint is made contradicts the accused as to the reason given by him for the taking of his pistol into the barn loft, or his reason for going into that part of the barn, and consists of an admission alleged to have been made by him to one R. A. Martin who, at the time, was a justice of the peace. The objection treats this declaration as an admission or confession of guilt, and proceeds upon the theory that the state before introducing it was

bound to show that it was voluntary by clearing away every possibility of its having been induced by some assurance given or representation made, by one in authority over the prisoner. Neither the statement of the accused nor the admission made to Martin, as to his motive or reason for going into the barn loft, imported any intention to harm Ball. In the one instance, his purpose was to throw down feed and, in the other, to kill Ball's dog. The motive as to which the two statements conflict does not extend to Ball himself. The contradiction no doubt had some bearing upon the creditability of the accused as a witness, and the jury's finding upon the issue thus made between the two witnesses may have been probative on the issue of guilt, but that does not bring it within the rule governing admissions or confessions of guilt of the crime charged. Manifestly, the objection is not well taken. To extend the rule to admissions of merely incidental circumstances of this kind would greatly embarrass the administration of justice, without production of any beneficial results.

Instruction No. 2, given for the state and defining malice as an essential element of murder, may be justly regarded as being incomplete, since it does not distinguish between the two degrees of statutory murder, but it accords with the law as far as it goes and does not expressly conflict therewith. The possible implication of a lack of degrees, arising from failure to mention them, is negatived by an instruction given for the accused and carefully and accurately defining all the offenses provable under the indictment. Malice is a necessary ingredient of each of the degrees of murder. Mere incompleteness of this instruction does not vitiate it. *State* v. *Prater,* 52 W. Va. 132; *State* v. *Kellison,* 56 W. Va. 690.

There was a sufficient basis in the evidence for instruction No. 3a, given for the state. The accused occupied a concealed position at the time of the shooting. He was in the loft of a barn, looking out through a latticed window. From that position, he fired the injurious shot, and a witness squarely contradicts him as to provocation or danger, as well as Ball's position and conduct at the time of the attack upon him. Notwithstanding his protestation of innocence in his resort to that position, the testimony of Kessinger and perhaps that of other

witnesses, constituted evidence of a lying in wait with intent
to kill, amply sufficient to justify the giving of an instruc-
tion telling the jury the law applicable to murder perpetrated
in that way.

Instruction No. 8, given for the state accords literally
with one given and approved in *State* v. *Hatfield,* 48 W. Va.
561, 571. · One very similar to it was disapproved in *State* v.
*Mann,* 48 W. Va. 480, 485, and also in *State* v. *Johnson and
Devinny,* 49 W. Va. 684, 693. There is a somewhat similar
ruling in *State* v. *Hertzog,* 55 W. Va. 74. This instruction
says the burden of proving self-defense rests upon the prison-
er, and to avail him, the facts and circumstances showing such
defense must be established by a preponderance of the evi-
dence. If its incompleteness, unaided, would be fatal, un-
der the view expressed in *State* v. *Mann,* it is cured or sup-
plied by instruction No. 7, given for the state, saying the
exculpating circumstances may appear from the case made by
the state. All instructions given should be read and con-
sidered together and if, being so treated, they correctly state
the law, mere incompleteness of one or more of them is harm-
less. *State* v. *Clifford,* 59 W. Va. 1; *State* v. *Kellison,* 56 W.
Va. 690. This principle sustains instruction No. 14, given
for the state, also. · It is verbally inaccurate, saying specific
intention to commit murder, meaning to kill, may be presum-
ed from deliberate use of a deadly weapon and may be
proven and inferred from all the evidence. Another instruc-
tion given for the defendant fully explains the distinction be-.
tween first and second degree murder, turning on the pres-
ence or absence of specific intent to take life. Hence, the in-
accuracy noted could not have mislead the jury.

Indulgence of the accused in the practice of repeating in-
structions on the subject of reasonable doubt, precludes right
in him to complain of the same practice on the part of the
state. The trial court may have permitted more repetition
by both sides than was necessary or beneficial, but, if so, the
errors counterbalance and neutralize one another. In the
conduct of the parties, there was reciprocal inducement to
the judicial action complained of, wherefore neither of them
is in a situation to take advantage of such error as may have

resulted. A prisoner cannot be heard to complain of mere errors in procedure, not violative of any constitutional guaranty, that he himself has induced or caused. *State* v. *Taylor,* 57 W. Va. 228, 245. One of the three instructions pertaining to reasonableness of doubt, given for the state, contains an expression condemned in *State* v. *Taylor,* cited, and *State* v. *Alderson,* 74 W. Va. 732, to the effect that a juror's oath imposes no obligation upon him to doubt, where no doubt would exist if he were not acting under oath. It is here again disapproved, but there is no occasion to say whether the error in the giving thereof would alone justify the award of a new trial.

The assault made upon the rejection of instructions Nos. 17, 18, 19, 20 and 21, requested by the defendant, is based upon a misapprehension of the law, due to the generality of terms in which a certain legal proposition is sometimes stated. Their purpose was to tell the jury, the defendant could not be convicted of homicide, if the surgeon's negligent, wrongful or unnecessary removal of Ball's appendix, while he was yet alive and languishing from a mortal wound inflicted by the accused, hastened or accelerated his death. The sense in which these terms are used by the courts and text writers differs very materially from that in which these instructions use them. Mere contribution to the result of a mortal wound by a subsequent act of a responsible agency does not excuse the original act. The intervening, subsequent act must have been the proximate cause of the death. This is the clear import of the observations made in *State* v. *Wood,* 53 Vt. 560, *State* v. *Scates,* 50 N. C. 420, and *People* v. *Ah Fat,* 48 Cal. 1. It must have hastened or accelerated death by actual causation thereof, *proprio vigore,* at an earlier moment, hour or day than it would have occurred, but for the intervening act. *People* v. *Lewis,* 124 Cal. 551; *Com.* v. *Costley,* 118 Mass. 1. "Of course, when after a wound a new and independent causation intervenes, producing death, this relieves parties to whom such new causation is not imputable. But the co-operation of other contemporaneous or prior conditions does not relieve the party charged. He who turns the scale is chargeable with the result. In other words, a cause is, in this sense, that condition which determines the final result. It is the

preponderating condition." 1 Whar. Crim Law, 11th Ed., sec. 194. "The test of the guilt of the person inflicting the first wound in such case is whether, when death occurred, the first wound contributed to the event. If it did, although other independent causes also contributed, the causal relation be-tween the unlawful acts of the accused and the death is made out." Whar. Hom. 3rd Ed., sec. 33. This view accords with a legal principle often applied, and it is not inconsistent with any conclusion announced in *State* v. *Angelina*, 73 W. Va. 146. Instruction No. 15, given at the request of the accused and telling the jury that, in order to convict of homicide, they must believe beyond reasonable doubt, the deceased came to his death as a result of the gunshot wound, and that, if they belcieved the death resulted from the removal of his appendix, or if they had reasonable doubt as to whether it did or not, they should find the accused not guilty of the homicide alleg-ed, is substantially correct and suffices for submission of the hypothesis relied upon. Instruction No. 22, requested by the accused, was properly refused. Mere words of the deceased, used before the shooting, cannot justify it. There must have been an overt act.

The third and fourth assignments of error are well found-ed. When witness Wiatt was interrogated as to the declar-ation alleged to have been made to him by Zeb Ball, an ob-jection was interposed and overruled. Thereafter, the court and attorneys on both sides retired to an ante-room, and there the question was answered and numerous others pro-pounded and answered. For the purpose of showing the ex-istence of friendly relations between the accused and the deceased, the state offered to prove by witness Boggs, that the deceased, on Dec. 10, 1915, had declared his intention to have the accused write a deed for him, on the ground that he was a cripple and needed the compensation therefor. When the question was asked and an objection interposed, the court, without having ruled upon the objection, retired to the ante-room with counsel and there heard the argument upon the objection and overruled it. After their return to the court room, the witness answered the question.

It cannot be assumed or presumed that the prisoner ac-

companied the judge and attorneys, when they left the court room. The record does not say so. On the contrary, it impliedly says he did not. Naming those who went, it omits him. If he went along, the record should show the fact affirmatively. *State* v. *Younger,* 2 W. Va. 579; *State* v. *Conkle,* 16 W. Va. 736; *State* v. *Sutfin,* 22 W. Va. 771. It affirms the prisoner's presence at the bar of the court, in the court room, and, in the absence of disclosure of the contrary, he is presumed to have remained there. His absence on these occasions was made a ground of his motion for a new trial and he filed his uncontradicted affidavit, in support of the motion. This affidavit is incorporated in the bill of exceptions and the court does not certify any denial of the statements therein made. For reasons already stated, it is unnecessary to say whether the absence of the prisoner could be established by an affidavit. The record must show his presence at every stage of the proceedings. This is an often reiterated declaration of this and other courts.

The two transactions had in the absence of the accused are in all substantial respects like that for which a new trial was granted in *State* v. *Sutter,* 71 W. Va. 371. In the first, the court ruled upon the objection, before the retirement, it is true, but many other questions were propounded and responded to out of the court room. The subject matter was inadmissible evidence offered by the accused, but it was his privilege and right to see and hear what transpired, concerning it. This is true also of the discussion and ruling upon his objection to the testimony of Boggs, introduced by the state.

On the allowance of a new trial for mere error in procedure, the usual practice is not to enter upon any inquiry as to the sufficiency of the evidence to sustain a verdict. In very plain cases of insufficiency, the appellate courts sometimes declare it. The briefs filed in this case do not argue the question, the evidence is conflicting and no reason for departure from the general rule is perceived.

For the error in procedure in the absence of the accused, the judgment will be reversed, the verdict set aside and a new trial awarded.                    *Reversed and remanded.*