# CHARLESTON.

## STATE v. WORLEY.

### Submitted April 23, 1918.    Decided April 30, 1918.

1. WITNESSES—*Impeachment—Inconsistent Statement.*

    After the foundation therefor is properly laid by calling his attention to prior statements inconsistent with his testimony, a witness may be impeached by proving such statements, and whether the witness denies or fails to recollect them is not material. Point 1 of the syllabus in *Robinson* v. *Pitzer,* 3 W. Va. 335, disapproved. (p. 351).

2. CRIMINAL LAW—*Harmless Error—Cross-Examination.*

    Where a witness has made previous statements in the form of answers to questions propounded to him in the presence of witnesses, respecting a matter as to which he is examined as a witness in the trial of a case, and such statements are taken down by a stenographer, when made, and thereafter transcribed by him, but not read to, or signed by the witness, and, during the examination of such witness for the purpose of laying a foundation for impeaching him, certain of the questions and answers thereto which apparently contradict his testimony are read over to him, and he is asked if he made them and he fails to recollect, and the whole of such statement is not offered in evidence, it is prejudicial error to refuse opposing counsel an opportunity to examine the paper for the purpose of enabling him to conduct an intelligent cross-examination of the impeaching witness. (p. 351).

3. HOMICIDE—*Instruction—Murder in First Degree—Premeditation—"Deliberate"—"Premeditate."*

    An instruction in the trial of a murder case telling the jury, if they believe beyond all reasonable doubt that the prisoner "feloniously, wilfully, maliciously, deliberately and unlawfully did kill James Griffith with a deadly weapon," then it is (their) duty, under the law, to find (the prisoner) guilty of murder of the first degree as charged in the indictment," is proper. The element of premeditation is comprehended in the term *deliberately* used in the instruction, the words, *deliberate* and *premeditate,* being employed in the statute as synonymous terms. (p. 354).

4.  CRIMINAL LAW—*Instruction—Reasonable Doubt.*
    An instruction, attempting to define the terms "reasonable
    doubt," and concluding with these words addressed to the jury,
    "if you doubt as men you should doubt as jurors; if you do not
    doubt as men you should not doubt as jurors," should be refused.
    (p. 356).

Error to Circuit Court, Raleigh County.

Flynn Worley was convicted of murder in the first degree, and from a judgment of the circuit court, affirming the conviction, he brings error.

*Reversed and remanded for new trial.*

*J. M. McGrath, J. M. Anderson, A. P. Farley,* and *C. M. Ward,* for plaintiff in error.

*E. T. England,* Attorney General, and *Charles Ritchie,* Assistant Attorney General, for the State.

WILLIAMS, JUDGE:

Flynn Worley was convicted of first degree murder in the criminal court of Raleigh county and, on recommendation of the jury, was sentenced to confinement in the penitentiary for life. On writ of error to the circuit court the judgment was affirmed, and he now prosecutes this writ of error to that judgment.

James Griffith was killed about 1:30 o'clock P. M. on the 22nd of June, 1916, in Flynn Worley's house, not far from the town of Beckley, by a shot fired from a pistol belonging to defendant. The ball entered near the corner of his right eye and passed through his head at the base of the brain and lodged at the lower part of the left ear. The defense is that said Griffith accidentally shot himself with Worley's pistol which, it is claimed, he was handling at the time, and there is testimony tending to support that theory. There were only two eye-witnesses, besides Worley, to the tragedy, a woman named May Meadows, who lived with him, and Mrs. Kessel, sometimes spoken of in the record as Mrs. Muncy, who lived about one-half mile away, and who came to Worley's house at the solicitation of himself and May Meadows to meet Griffith, who had requested her to get a woman for him. After an inquest over the body of deceased was held, Worley and

the two women above named were arrested and placed in separate cells in the jail. During their incarceration, and before any trial was had, May Meadows, who is the most important witness for the defense, made a voluntary statement to J. Q. Hutchinson, the prosecuting attorney, in the presence of G. W. Williams, as to the way in which deceased was killed and the circumstances surrounding the tragedy. She was sworn by the prosecuting attorney before making her statement, and then made it in the form of answers to questions propounded to her by that officer. The questions and answers were taken down by a stenographer at the time and were afterwards transcribed into longhand by him, but they were not read over to the witness and were not signed by her. She was asked on cross-examination, if she did not, on that occasion, make certain answers to certain questions, which questions and answers were read to her from that document, and her answers were that she did not recollect. The prosecuting attorney and G. W. Williams were then examined as witnesses by the state for the purpose of impeaching her testimony and they both testified that she did make the statements at the jail as to which she had said she did not recollect. These statements apparently contradict material portions of testimony before the jury. It is insisted that this impeaching testimony was improperly admitted, that a witness who simply answers that he does not recollect, cannot be thus impeached. This contention is not supported by the authorities, in fact it is contrary to the rule laid down by most of the text-writers on evidence and adopted by nearly all the courts of this country. 2 Elliott on Evi., Sec. 975; 5 Jones on Evi., Sec. 845; 5 Chamberlayne on Evi., Sec. 3759; and 2 Wigmore on Evi., Sec. 1037. The author last cited says the answer of the witness to the question is wholly immaterial. The purpose in asking a witness whether, on a previous occasion, he did not make a certain contradictory statement, specifying the substance of it and the time and place and the person or persons to whom made with reasonable certainty, is to give the witness an opportunity to contradict or explain it by showing, if he can, that it is not in effect a contradiction of his testimony. The only material

point is whether he did, in fact, make the inconsistent statement. If he is given an opportunity to deny or explain, and does not remember, the foundation for impeachment is properly laid. The rationale of the rule is fairness and justice to the witness by giving him an opportunity to deny making the statement or explain apparent discrepancies before impeaching him, and when this opportunity has been afforded him the rule has been complied with. His failure to recollect does not preclude the right of impeachment by proving prior inconsistent statements. For additional authority on this point, see *Forde* v. *Commonwealth,* 16 Grat. 547; and 40 Cyc. 2738, citing numerous decisions from many states and from the courts of the United States. Our own case of *Robinson* v. *Pitzer,* 3 W. Va. 335, would seem to be in conflict with our present holding on this point. The impeaching testimony was there held to be erroneously admitted because the proper foundation therefor had not been laid. The witness had answered that he did not remember to have had a certain conversation with certain parties named at a certain time and place, respecting the execution of a deed by himself to another party. We are inclined to think that was a sufficient foundation for impeaching testimony, and so far as that decision is inconsistent with the present holding it is disapproved.

The stenographer's notes of the questions and answers were used at the trial by the attorney for the state both in framing his questions on the cross-examination of May Meadows and in the examination of the impeaching witnesses. After the impeaching witnesses had been examined, counsel for the defendant asked permission of counsel for the state to examine the stenographer's notes before cross-examining said witnesses, which was refused. They then moved the court to require the state's counsel to permit such examination, and the court overruled their motion. This was prejudicial error.

It appears that May Meadows' statement was voluntarily made, no inducement in the way of threats, or offer of reward, or of her release from imprisonment was made by the prosecuting attorney. Although in the form of answers to questions propounded to her, it purports to be a complete history,-

of the tragedy and surrounding circumstances attending it, yet the witness' attention had been called to only certain parts of it. Counsel for the defense was entitled to see and examine it in order to determine whether, taken as a whole, her statement was inconsistent with her testimony, and if not, justice required that that fact be made known to the jury. It is possible that her statement, taken altogether, is not inconsistent with her testimony on the witness stand, and defendant's counsel were entitled to know all the paper contained before cross-examining the witness. The document is somewhat in the nature of an unsigned deposition, although of course not itself evidence. In *Chicago & Alton R. Co.* v. *Robinson,* 16 Ill. App. 299, a stenographer, who had taken shorthand notes of the testimony of a witness at a former trial of the case, was offered as an impeaching witness, and testified that he had no independent recollection of the evidence but that his notes were fully and correctly written at the time the testimony was given. The court there held the production of the writing itself was necessary in order that the opposite party might be able to cross-examine in reference to it. "Where a witness on cross-examination is asked if he did not write a statement shown him, contained in a letter, which standing alone is inconsistent with his testimony in chief, and admits having written it, it is the privilege of counsel introducing the witness to inspect the entire letter for other statements which may explain or qualify the expression admitted; and the denial of such inspection, where the testimony of the witness is material, is prejudicial error." *Wright* v. *Bragg,* 96 Fed. 729.

In *Dunbar* v. *McGill,* 69 Mich. 297, it was held that where a witness was questioned in regard to his testimony on a former trial, after which a portion of such testimony was read, it was error to exclude the reading of the balance of the testimony by the opposing counsel. The fact that May Meadows did not sign the statement is no reason for denying opposing counsel the right of inspection. See also 7 Ency. of Evi. 136, and 40 Cyc. 2463.

The giving of instructions Nos. 2 and 4 for the state is assigned as error. They are as follows:

"No. 2. The court instructs the jury that if you believe from the evidence in this case beyond all reasonable doubt that the prisoner, Flynn Worley, on the 22nd day of June, 1916, in the County of Raleigh and State of West Virginia, feloniously, wilfully, maliciously, deliberately and unlawfully did kill James Griffith with a deadly weapon, then it is your duty, under the law, to find him guilty of murder of the first degree as charged in the indictment in this case."

"No. 4. The court instructs the jury that any wilful, deliberate and premeditated killing of a human being is murder of the first degree; and the jury is further instructed that if you believe from the evidence in this case beyond all reasonable doubt that the prisoner, Flynn Worley, on the 22nd day of June, 1916, in the County of Raleigh, State of West Virginia, with a deadly weapon did feloniously, wilfully, maliciously, deliberately and unlawfully kill James Griffith, then it is the duty of the jury under the law to find the prisoner guilty of murder of the first degree."

It is contended that the omission of the word *premeditatedly* in these instructions renders them both bad, that it is indispensable to define first degree murder. However, they both contain the word *deliberately,* which is a synonomous term. Webster defines the word *deliberate,* "To take counsel; to weigh the arguments for and against a proposed course of action; to reflect; to consider;" and he defines the word *premeditate,* "To think, consider, deliberate, or revolve in the mind beforehand." Sec. 1 of Ch. 144 of the Code, defining murder in the first degree, uses these words, "any wilful, deliberate, and premeditated killing." But in the form of indictment, prescribed in the same section, for that offense the term premeditatedly is omitted and the term deliberately only used, thus clearly indicating that the legislature regarded it alone as sufficient to comprehend and define that essential element of the offense. The word deliberate, as used in that statute, is synonomous with the word premeditate as therein used. 2 Words & Phrases, 1953; *Cannon* v. *State,* 60 Ark. 564; and *Bower* v. *State,* (Mo.) 32 Am. Dec. 325. The opinions in *State* v. *Hobbs,* 37 W. Va., at page 827, and in *State* v. *Dodds,* 54 W. Va. 297, seem to draw a

distinction between the terms premeditate and deliberate, and to hold that the former is not comprehended in the meaning of the latter. We hardly think there is any real foundation for the distinction; it is hypertechnical and certainly not warranted by any definition of these terms as given by lexicographers. So far as those cases hold that the element of premeditation, in first degree murder, is not comprehended in the term deliberation, they are disapproved.

The State's instruction No. 3 is on the subject of reasonable doubt, and closes with these words: "If you doubt as men you should doubt as jurors; if you do not doubt as men you should not doubt as jurors." The effect of this is that their oath imposes no obligation to doubt, if they did not otherwise doubt. It is doubtful if the meaning of the words "reasonable doubt," can be made any clearer or plainer to intelligent men by any definition thereof that can be given, and instructions attempting to define a reasonable doubt are generally condemned by the text-writers on evidence. 4 Wigmore on Evi., Sec. 2497; 2 Chamberlayne on Modern Evi., Secs. 996b and 1016; and 2 Thompson on Trials (2nd ed.), secs. 2 and 463. The giving of such an instruction has been held by this court, in some instances, not to be reversible error, *State* v. *Gunnoe,* 74 W. Va. 741; in others it has apparently been approved, *State* v. *Bickle,* 53 W. Va. 597, 600, and *State* v. *Koch,* 75 W. Va. 648; and in others it has been disapproved, although not held to be reversible error. *State* v. *Taylor,* 57 W. Va. 228 and *State* v. *Alderson,* 74 W. Va. 732. The last expression from this court on the subject is found in *State* v. *Snider,* 81 W. Va. 522, 94 S. E. 981. Any attempted definition of terms of such common use and self-evident meaning as "reasonable doubt" is more apt, we think, to confuse rather than enlighten a jury, and while we do not say the giving of the instruction is cause for reversal, the better practice is to refuse such instructions.

Inasmuch as the judgment will be reversed for the reasons stated, and the cause remanded for a new trial, we decline to express any opinion on the weight of the evidence, or whether it is sufficient to support the verdict. The judgment is re-

versed, the verdict set aside and the cause remanded for a new trial.

*Reversed and remanded for new trial.*