# CHARLESTON.

## STATE v. ROLLIN R. PRICE.

### Submitted October 22, 1918.  Decided November 15, 1918.

1. INDICTMENT AND INFORMATION—*Evidence—Worthless Check.*

    An indictment for procuring property or other thing of value by the issuance of a check therefor, without funds in the bank to meet the same, in the form prescribed by § 34 of ch. 145 of the Code, is sufficient on demurrer. (p. 75).

2. BANKS AND BANKING—*Worthless Check—Defenses.*

    The provision in the statute permitting one who has given a check, without funds in the bank upon which it is drawn, to successfully defend an indictment against him by showing that he has paid off said check within twenty days after demand being made upon him, is a declaration that such payment of the check after demand, and within twenty days, is evidence of lack of fraudulent intent on his part. (p. 75).

3. SAME—*Worthless Check—Evidence—Fraud.*

    Where one, without sufficient funds in the bank to meet a check which he has given in payment for property delivered to him at the time of the issuance of the check, subsequently, and before the presentation of such check deposits in the bank sufficient funds to meet the same, with the agreement that such funds are deposited for the express purpose of paying said check, and the bank, before the presentation of the check for payment, diverts such funds to another purpose, the drawer thereof cannot be held guilty under section 34 of ch. 145 of the Code. Such deposit of funds in the bank for the express purpose of paying the particular check negatives any fraudulent purpose upon his part as fully as though he had paid off the check after it had been dishonored, and within twenty days after demand upon him therefor. (p. 75).

4. CRIMINAL LAW—*Instructions—Defenses.*

    An instruction given on behalf of the state directing the jury to find the defendant guilty if a certain state of facts is true, but which excludes from their consideration a good defense set up and relied upon by him, is erroneous. (p. 77).

5. BANKS AND BANKING—*Worthless Check—Defenses.*

    In a prosecution under § 34 of Ch. 145 of the Code against one for obtaining property by means of a check, without funds in the bank upon which it is drawn, it is not error to refuse to permit the defendant to show that shortly after the check

was dishonored and demand made upon him for its payment he was forced into bankruptcy, and his property taken away from him by an officer of the bankruptcy court.    (p. 77).

6.  CRIMINAL LAW—*Instructions—Reasonable Doubt.*
    An instruction which tells the jury that they should not doubt as jurors unless they doubt as men should not be given.    (p. 78).

7.  SAME—*Instructions.*
    An instruction in a criminal case which tells the jury that if they believe the defendant guilty to a moral certainty, without requiring such belief to be based upon the evidence introduced in the case, should not be given.    (p. 79).

8.  BANKS AND BANKING—*Worthless Check—Delay in Presentation.*
    The failure of the payee in a check to present it within a reasonable time will not affect the liability of the drawer of such check to indictment, under § 34 of ch. 145 of the Code, for obtaining goods or other property by giving a check therefor without having sufficient funds to meet the same, where it appears that the drawer of the check did not lose anything by reason of the failure to present the same earlier than it was actually presented.    (p. 80).

Error to Circuit Court, Randolph County.

Rollin R. Price was convicted of procuring money by check without funds to meet the same, and brings error.

*Reversed and remanded.*

*W. E. Baker, R. S. Irons, Smith & Jackson,* and *R. G. Linn,* for plaintiff in error.

*E. T. England,* Attorney General, and *Charles Ritchie,* Assistant Attorney General, for the State.

RITZ, JUDGE:

Rollin R. Price was convicted in the circuit court of Randolph county of procuring a certain lot of cattle by giving a check therefor without having sufficient funds to meet the same, in violation of § 34 of ch. 145 of the Code, and to a judgment sentencing him to be confined in the penitentiary he prosecutes this writ of error.

For many years the defendant was extensively engaged in the business of buying and selling cattle through a number of adjoining counties of the state. In the year 1915 he arranged to purchase from Mrs. Pettit, the prosecuting wit-

ness, twenty-eight head of cattle.  On the first day of October of that year he went to the Pettit place and there had the cattle weighed, · the purchase price ascertained, and gave Mrs. Pettit a check therefor, which is the basis of the indictment in this case.  The cattle were then loaded on the cars and shipped to market.  Mrs. Pettit deposited this check in a bank at Beverly near her home, and when it reached the bank at Jane Lew, upon which it was drawn, it was dishonored for want of funds with which to pay it.  Price was notified of this fact, and did not pay the check within the time provided by § 34 of ch. 145 of the Code; in fact he did not pay it at all, and this indictment resulted.  During the season of 1915 Price was selling his cattle to the firm of Shannon & Ferrell, commission merchants of Pittsburg.  On July 7, 1915, this firm wrote a letter to the People's Bank, of Jane Lew, West Virginia, the bank upon which this check was drawn, advising that bank that the firm would accept drafts drawn by R. R. Price against shipments of live stock, when the drafts were not made before the day of shipment, and had indicated on them the number of cars contained in the shipment, and the name of the station at which they were loaded.  This letter was received by the bank of Jane Lew, and Price had during that season been drawing drafts in accordance therewith, and. these drafts had been theretofore honored.  Before starting to the home of Mrs. Pettit to take up her cattle Price went to the bank of Jane Lew and advised the cashier that he was going to take up Mrs. Pettit's cattle, as well as some others, and that he would draw checks for the purchase price of the cattle, and asked the cashier if he would advise the parties to whom such checks were issued, should they make inquiry over the telephone, that the checks would be paid upon presentation, at the same time stating that he would upon his return draw a draft upon his correspondent in Pittsburg to cover the amount of such checks.  The officer of the bank to whom he made this statement advised him that it would be all right.  Upon Price's return he did · draw a draft upon the firm of Shannon and Ferrell in Pittsburg for forty-five hundred dollars on account of the cattle he had taken up, including the Pettit cattle, and de-

posited this draft in the bank to his credit. Before giving him credit for the amount the bank wired the firm of Shannon and Ferrel and asked them if the draft would be accepted, and on the same afternoon, which was the second day of October, the bank was advised that Shannon and Ferrell would accept the draft. Upon receipt of this telegram the amount of forty-five hundred dollars was placed to Price's credit. Price then left home for a week or ten days, and during the time he was away, and before the presentation of the check of Mrs. Pettit, Shannon and Ferrell wired the bank to reduce the draft to thirty-five hundred dollars instead of forty-five hundred dollars, and this the bank did without consulting Price, or without his knowing anything about it. During Price's absence it is also shown that drafts were drawn on him by Shannon & Ferrell, and were accepted and paid by the bank out of his funds for considerable amounts, the officers of the bank stating that Price had authorized them to accept any drafts drawn on him by Shannon & Ferrell. The combined effect of the reduction of his forty-five hundred dollar deposit to thirty-five hundred dollars, and the payment of the drafts drawn by Shannon and Ferrell, was to reduce the balance in the bank to such an extent that when Mrs. Petit presented her check for $2,477.25 there were not funds sufficient to meet the same and it was protested. Upon Price's return demand was made upon him to make the check good, and he promised to do so, but claims that within a few days he was thrown into involuntary bankruptcy, all of his property seized and taken from him, and he was unable to make any arrangement to meet the check. There is no contradiction in the evidence as to the foregoing facts, but Price states in addition thereto that the forty-five hundred dollar draft was deposited with an understanding with the bank officer taking the same that the checks drawn by him to pay for the three carloads of cattle, and particularly the check drawn to pay Mrs. Pettit, were to be paid out of this forty-five hundred dollars; in other words, he contends that it was agreed between him and the officer of the bank that this forty-five hundred dollars was deposited for the particular purpose of meeting the checks given by him in

payment for the cattle for which the forty-five hundred dollar draft was drawn upon Shannon & Ferrell. The bank officer, however, who received the deposit, denies that this was so, but says that it was deposited just as any other item of credit.

The first error assigned is to the action of the court in overruling the demurrer to the indictment. The indictment is in the form prescribed by section 34 of ch. 145 of the Code, but it is contended that this form is not sufficient inasmuch as it does not require an averment that after the dishonor of the check demand was made for its payment, and this demand not met in twenty days. Ordinarily where the legislature prescibes a form of pleading it will be sufficient to follow the requirements thereof. In many jurisdictions the whole matter of pleading and practice is regulated by forms prescribed by the· legislature. We cannot say that there is any essential element of the offense omitted in the indictment in this case. It is true, a party drawing a check when he has not sufficient funds in the bank with which to meet it may excuse himself from prosecution by paying the check within twenty days after demand, but the essential elements of the offense created by this section are the making of the false representation and the obtaining of the goods of another thereby. Of course, as in most criminal cases, the element of intent is necessary. The legislature in passing this statute had in view the fact that a man might mistakenly give a check without funds in the bank to meet it, but if such were the case that he would rectify the error as soon as it was brought to his attention. The fact that the offense may be excused by showing that the defendant made good the check within the twenty days simply goes to the question of his criminal intent, it being declared by the legislature that if the check is made good within that time there is no fraudulent intent, and can be no conviction. We think, therefore, the indictment in the form prescribed by the statute is sufficient on demurrer.

The defendant next assigns as error the refusal of the trial court to permit him to prove that almost immediately after his attention was called to the fact that the check was

not paid he was forced into involuntary bankruptcy, his property seized, and he rendered unable to raise the funds to meet the check. Is this evidence material to his defense? As before stated, the elements of this offense are the making of false representations or pretenses, and the securing of another's property thereby. The fact that a man was on the verge of bankruptcy and subsequently forced into bankruptcy might rather tend to strengthen the presumption of fraudulent intent than to relieve him of it. It would not be evidence tending to show that he did not have such fraudulent intent at the time he issued the check. Who would know better his condition than himself? He must take notice of this condition. This evidence would not in any degree tend to prove that he was mistaken when he issued the check and therefore had no criminal intent. The fact that proof that he made the check good within twenty days releases from criminal responsibility is only a declaration by the legislature that this fact shows he was without criminal intent at the time he issued the check; in other words, that he issued it under a mistake of fact, and presupposes that he has ample means with which to meet the obligation, and that it is only necessary to make them available at the particular bank upon which the check is drawn. His insolvent condition would not in any wise tend to establish these facts, but would rather tend to prove that he did not have the assets available for the purpose. We do not think there was any error in rejecting this evidence.

The action of the court in giving the state's instruction No. 1 is also assigned as error, and this may be considered in connection with the assignment of error based upon the court's refusal to give defendant's instruction No. 7. The defendant's contention is that he deposited the forty-five hundred dollar draft in the bank with an agreement that it was to be used in the payment of the check upon which this indictment was based, among others, given by him for the purchase of cattle, and that the bank by allowing this draft, after it had been accepted, to be reduced by the amount of one thousand dollars, and paying other drafts drawn on him without his knowledge, improperly diverted the funds which

he had deposited for the particular purpose of paying this check. It is not denied that at the time Price drew this check he did not actually have the funds in the bank with which to meet it, and it is also not denied that the bank officer agreed to advise any person to whom he gave such a check that it was all right and would be paid. It is also not denied that Price did draw the draft for forty-five hundred dollars, and that this draft was drawn because of the shipment of these very cattle, and it is also uncontroverted that the bank had this draft accepted by telegraph on the same day that it was drawn, and placed it to Price's credit. There is a conflict in the evidence as to whether it was specially deposited for the purpose of paying these checks given for cattle, or whether it was made as a general deposit. The court below evidently took the view that whether it was deposited for this special purpose or not made no difference. It cannot be doubted that under this statute, if Price had collected this forty-five houndred dollars himself and kept the money until demand was made upon him personally for the payment of the check after dishonor, and had then paid it out of the forty-five hundred dollars, he would not be guilty under the statute. He could after the check was dishonored make it good. Why could he not make it good before it was dishonored? The fact that he provides funds for meeting the check, or makes it good after its dishonor, shows lack of criminal intent. It show the absence of the purpose to defraud, and it occurs to us that if the jury had believed in this case that Price did deposit this money in that bank before the check was presented, with the understanding that this money was to be applied to the payment of that check when it was presented, that it is a good defense to the indictment. The fact that the bank misappropriates that money afterwards and applies it to another purpose does not make Price criminally responsible. The state's instruction No. 1 entirely disregards this defense and directs the jury to find the defendant guilty if the jury found that he did not have the money in the bank at the time he drew the check and did not make it good within twenty days after demand. This instruction was in fact peremptory for the reason that all

of the facts which the jury were required to find in order to show guilt are admitted, and entirely excludes the defendant's defense that he had provided the funds and that the bank had made an unauthorized use of them. We, therefore, think that instruction No. 1 given on behalf of the state was wrong insofar as it excluded this defense, and the refusal of the court to give instruction No. 7 is likewise wrong inasmuch as this instruction attempted to present this defense to the jury. We do not mean to say that Price actually deposited this draft with that understanding, although there are many circumstances which strongly tend to sustain his contention. The action of the court below, however, excluded from the consideration of the jury this theory entirely, and in effect told the jury that absence of criminal intent could only be shown by proof that the check was paid after it had been dishonored. It occurs to us that it would be stronger evidence of the absence of criminal intent if it were shown that the drawer of the check provided funds to meet it before it was dishonored than by showing that he had waited for the dishonor of the check and then provided the funds. If Price's contention is true as between the holder of this check and the bank, the funds are there, and upon the bank's refusal to pay the check suit could be maintained against the bank to recover the amount thereof. Of course, this is a question of fact. The bank officers deny Price's theory, but it should have been submitted to the jury, and their finding of guilt made to depend upon their determination of this question of fact.

It is also complained that the court erred in giving state's instruction No. 2. This instruction told the jury that a reasonable doubt is not a vague and uncertain doubt, and that what the jury believed from the evidence as men they should believe as jurors. This sort of attempt to define such simple and well understood language as reasonable doubt has been condemned by this court in a number of cases, notably that of *State* v. *Taylor*, 57 W. Va., 228; *State* v. *Alderson*, 74 W. Va., 732; *State* v. *Snider*, 81 W. Va., 522; *State* v. *Worley*, 82 W. Va., 350, 96 S. E., 56; *State* v. *Cook*, 81 W. Va., 686, 95 S. E., 792; *State* v. *McCausland*, 82, W. Va., 525,

96 S. E., 938. Ordinarily the attempt to define such simple terms as reasonable doubt but results in confusion. Metaphysical disquisitions as to the meaning of these terms as a rule are either entirely without effect upon the jury or else have a mischievous one. Further than this, as we have repeatedly heretofore stated, this sort of an instruction is an invitation to the jury to disregard their oaths in considering the evidence. While in the minds of many an oath administered to a juror may appear supererogatory, but so long as it is one of the essential requirements of the law of the land the courts cannot so regard it. While we have never reversed a conviction upon this ground alone, in the case of the *State* v. *Young,* decided at this term of this court, we expressed the opinion that there might be cases in which the giving of this instruction would compel us to reverse them. Certain it is that it can accomplish no purpose but a mischievous one, and in no case should it be given.

Instruction No. 4 given by the state is criticised. It tells the jury that if they are morally certain of the defendant's guilt they should so find. The moral certainty which this instruction tells the jury is sufficient evidence of guilt may be based upon things which the jurors know aside from the evidence that has been introduced in the case; it may be based upon prejudice, or upon conduct of the accused in connection with other matters. Manifestly it would be improper to convict a man of a crime because the jury may be morally certain of his guilt when that moral certainty arises from its knowledge of his general course of dealing. It is not inconceivable, and frequently it is the case that men have a reputation in the community undeserved which lead a considerable number of their neighbors to believe them guilty whenever they are suspected of any offense, and this belief in the minds of many is so strong as to amount to moral certainty of guilt as soon as a charge of crime is made. This instruction does not limit the jury to the consideration of the evidence introduced in the case, but allows them to arrive at this state of moral certainty from anything. This is as broad as their range of knowledge or information, and

manifestly should not have been given. *State* v. *Shepherd,* 49 W. Va., 606.

The defendant also contends that it was error for the court to refuse his instruction No. 5. This instruction tells the jury that it is the duty of a person receiving a check drawn on a bank in another place to forward it direct to the place where the bank is located for payment, and that the plaintiff failed to present her check within a reasonable time, for which reason Price is relieved of all liability. This instruction is based upon § 186 of ch. 98a of the Code, being the negotiable instrument law. That section provides that a check must be presented within a reasonable time after it is issued or the drawer will be discharged from liability thereon to the extent of the loss caused by the delay. We cannot see what application that has to this case. The loss referred to in that section means loss to Price, and in this case Price lost nothing by the failure to present this check at the time it was presented rather than at an earlier time. If the bank had become insolvent before the presentment of the check, and this resulted in a loss to Price of the amount he had on deposit there to meet the check, that section would have application, but he cannot say that because the payee of the check has lost money on account of its being dishonored that Price is discharged from paying his debt.

What we have said disposes of all of the questions presented and results in a reversal of the judgment complained of.

*Reversed and remanded.*