# CHARLESTON.

## STATE v. MORRISON.

### Decided March 16, 1901.

1. MURDER—*Degree—Instruction—Judgment.*
    A judgment will not be reversed, in a case in which a verdict of murder in the second degree is clearly justified by the evi-

dence, because an instruction was given in the case embodying the law as expounded in point 11 of the syllabus in *Cain's Case,* 20 W. Va. 679. (p. 214).　.

2. HOMICIDE—*Degree of Crime—Excusable.*

The intent to do enormous or severe bodily harm with a deadly weapon, followed by homicide as the result of the execution of such intent, constitutes murder in the second degree, unless the act be done under such circumstances as render the killing excusable, or justifiable, or voluntary manslaugther. (p. 215).

3. MURDER—*Degree—Intent.*

A specific intention to kill is not essential to murder in the second degree, but it is essential to murder in the first degree. (p. 217).

4. INSTRUCTIONS—*Intent—Evidence.*

It is not error to refuse to give an instruction that gives undue prominence to isolated portions of the evidence, and therefore calculated to mislead the jury. (p. 218).

5. CRIME—*Evidence of Character—Self-Defense.*

Upon the trial of a person charged with the crime of murder, evidence of his good character may always be received as tending to disprove his guilt; but evidence of the ferocious, brutal, vindictive, or other dangerous character of the deceased is only admissible as part of the proof of self-defense, as tending to show the *bona fides* of the defendant's belief in the necessity of killing his assailant to save himself from death or great bodily harm. It is not error to refuse an instruction directing the latter class of evidence of character to be considered in determining generally the guilt or innocence of the accused. (p. 219).

Error to Circuit Court, Logan County.

Wirt Morrison was convicted of murder in the second degree, and brings error.

*Affirmed.*

JOHN B. WILKINSON and MARCUM, MARCUM & SHEPHERD, for plaintiff in error.

EDGAR P. RUCKER, ATTY. GEN., and LUTHER C. ANDERSON, for the State.

POFFENBARGER, JUDGE:

An indictment having been found and presented in the circuit court of Logan County, at the July term 1900, against Wirt Morrison, charging him with the murder of William Ruble in said county on the 28th of April, 1900, he was put upon his trial in

said court at the same term, and the jury returned a verdict of guilty of murder in the second degree. Motions to set aside the verdict and in arrest of judgment were made and overruled, and the court fixed his term of imprisonment at six years and pronounced judgment and sentence accordingly, but stayed the execution of the judgment and sentence on the motion of the prisoner for sixty days to enable him to apply for a writ of error; which application was made and the writ granted.

Prior to the morning on which Ruble received the blow from which he died next day, he, Morrison and one Dave Dempsey had, for a month or more, been working together in getting out timber on Big Spring branch in said county, for some persons named McDonald, during which time they occupied a small shanty. Having completed their work, they intended to abandon the camp that morning and go down to the stores of the McDonalds, who had separate stores not far distant from each other, to settle up, after which they were to seek other employment. They had procured some liquor and had been drinking some, and while at breakfast an argument arose between Morrison and Ruble which resulted in Morrison's striking the fatal blow with a heavy stick which they had used in attending their fire. There were some blacksmithing tools in the shanty and it is claimed that when Morrison struck him, Ruble was reaching for a horse-shoeing rasp lying on the mantel.

On this point Dempsey testifies as follows: "Well at the breakfast table they got into an argument about Mr. Sternberger that used to sell liquor at Huntington, and Mr. Ruble he asked Mr. Morrison if he knew him and Mr. Morrison said 'Yes.' Then Mr. Ruble said that he waited on him when he was sick, and he waited on him when he died, and that he never had two clerks in his saloon. Mr. Morrison said he knew he had two or three clerks, because some young men from his neighborhood or county had gone down there to clerk in his saloon, and Mr. Ruble disputed it. About that time as well as I remember, they got up from the table, Mr. Morrison and Ruble, and I turned to the table and commenced to bunch up the dishes. Mr. Ruble started around to the corner of the shanty to where the water bucket was, and Mr. Morrison went out like he was going out the door. I do not think Ruble got any water, but turned on to the door, too, and that put them both behind me, and something more was said,

about Sternberger, I do not remember just how it was; Mr. Ruble said, 'God d—n you, you are just like Jim Mac. you want everything your way,' and about that time I heard a lick and I turned around and Mr. Ruble was lying down with his head sorter under the stove. His head would have been under the stove if it had been up off the floor high enough, but any way his head was against it. I turned and grabbed him and said, 'Wirt, damn it, if I had wanted to whip him I would have taken my fist,' and he said, 'Dave, I would not have done it but he was reaching for that rasp.' "

Morrison testified in the case and gives the following account of his striking Ruble: "I went towards the door as if I were going out, and I think Ruble went toward the water bucket, but did not get him a drink, and about that time he started towards me, and when he got to this fire board, where there was a rasp lying out the edge of the mantel piece or board, he said, 'God damn you, you are just like Jim Mac, you want everything your own way.' He was gritting his teeth, and I turned around with my face towards him. There was a rasp lying on the end of the fire board, and as I turned facing him, Ruble turned his face this way (illustrating) and reached for the rasp. Just about the time his hand struck the rasp, I grabbed this stick (referring to the stick offered in evidence by the State's attorney) and hit him. * * * * I knocked him down. Dave was there at the table and he turned around and said, 'Wirt, damn it, if I had wanted to whip him, I would have taken my fist.' I said, 'Dave, I would not have hit him if he had not aimed to hit me with that rasp.' "

Soon afterwards Morrison and Dempsey gathered up their cattle and tools and went down to the stores to settle up, leaving Ruble in a helpless condition at the shanty where he was found shortly afterwards by persons to whom they had given information about the trouble, and taken to a house near by where he died the next morning. Morrison told several persons that day substantially what he and Dempsey have testified to. They give some reasons for thinking Ruble was not so badly injured as he was, in explanation of their leaving him there alone.

There were seven instructions given at the instance of the State to the giving of which the prisoner excepted, and made them the subject of his bill of exceptions No. 1. The prisoner requested the court to give seven instructions, of which No. 1 was given, Nos. 3, 5 and 7 refused, and Nos. 2, 4 and 6 modified and then

given and the action of the court in refusing Nos. 2, 3, 4, 5, 6 and 7 as requested, and in giving Nos. 2, 4 and 6 as modified, is excepted to, and made the subject of a bill of exceptions No. 2. Bill of exceptions No. 3 contains the evidence and exceptions to the overruling of motions to set aside the verdict and in arrest of judgment.

The first instruction for the State, is proper, and no reason is assigned why it should have been refused. The second instruction for the State is in almost the exact words of the eleventh point of the syllabus in *Cain's Case,* 20 W. Va. 679, the substance of which is that the killing is *prima facie* willful, deliberate and premeditated and therefore murder in the first degree, if the prisoner with a deadly weapon in his possession without any, or upon very slight provocation, gives another a mortal wound, and extenuating circumstances are not shown by the prisoner, or appear from the case made by the State.

If the evidence in this case did not clearly support the verdict of murder in the second degree, and put it beyond question that this instruction did not injure the prisoner in the trial of his case, the important, and often intricate, question of the distinction between the two degrees of murder might arise in considering whether, upon the evidence in the case, it was proper to give it. But, viewing the case in the light of second degree murder, it is wholly unimportant in determining that there is sufficient evidence to support the verdict, whether the prisoner had the deadly weapon in his possession at the beginning of the quarrel or took it into his hands and delivered the fatal blow in the same instant and as a single act. Nor is it material whether in delivering that blow he intended to take the life of the deceased. The instrument with which the wound was inflicted is proved by the result to have been a deadly weapon. It was for the jury to say whether the act was done in the heat of blood, and therefore amounted in law to manslaughter only, or in self-defense, and justifiable. They have failed to find, as matters of fact, that the act was done as the result of passion and heat of blood, or in self-defense, but on the contrary, that the blow was administered with a deadly weapon, and with the intent, at least, to do severe bodily harm, and from it death resulted; and there is evidence to support each of these findings. From these facts the jury might rightfully infer that the act was done maliciously.

In truth, the law implies the element of malice from these

facts, and thus all the elements of murder in the second degree are established. The only additional elements necessary to raise the offense to first degree murder are a specific intent on the part of the accused to take life, and deliberation and premeditation upon it before the performance of the act, without regard to the length of time of such deliberation and premeditation. These facts the jury did not find, for the verdict does not include them.

Counsel for the prisoner evidently proceed upon the theory that the circumstances of the case show the absence of any intention on the part of the prisoner to take away the life of deceased, in doing what he did. If his statement, "I would not have done it, but he was reaching for that rasp," may be regarded as a part of the *res gestae* and as showing that his intention in striking Ruble was merely to disable him and thus prevent an attack from him with the rasp, in the absence of circumstances constituting a case of self-defense, or to chastise him, or punish him for the insult offered, and the jury had found such to have been the intention, that finding would still be consistent with the verdict rendered.

A specific intent to take the life of the person killed is not a necessary element of common law murder, nor of murder in the second degree under our statute, unless it be such general and remote intention as may be deemed to be inherent in that degree of recklessness, wantonness, inhumanity and cruelty existing in the hearts of those who recklessly and wantonly do acts from which death ensues, as where one feloniously shoots at tame fowls with intent to steal them, and the ball accidentally hits a man and kills him; or where the prisoner shot at a person on horseback, and declared that he did so only with the intention to cause the horse to throw him, and the ball took effect on another person causing his death; or where it clearly appears that the intention of a person making an attack upon another was to maim and not to kill, if death resulted from it.

"At common law, the intent to do enormous or severe bodily harm, followed up by homicide, constitutes murder; though such an offense falls, in those states where this distinction exists under the head of murder in the second degree." Whar. Crim. Law s. 315.

"Where a homicide is proved, the presumption is that it is murder in the second degree." *Cain's Case,* 20 W. Va. 681.

"The offense of homicide by a workman throwing timber from

a house into the street of a populous city, without warning, or of a person shooting at a fowl, *animo furandi,* and killing a man, are instances of murder in the second degree." *Whiteford* v. *Com.,* 6 Rand. 721.

In *Souther* v. *Com.,* 7 Grat. 673, the killing of a slave by his master and owner by willful and excessive whipping, burning, choking and stamping, until the slave died under the infliction of the punishment, was held by the court to be murder in the first degree, although the jury had found a verdict of second degree murder, but Judge Leigh dissented, holding that to constitute first degree murder there must be an intention to kill. But was there not enough in that case to warrant the jury in finding the existence of such specific intention?

In *State* v. *Decklotts,* 19 Iowa 447, it was held that, "A specific intention to kill is not essential at common law to constitute murder, nor is it essential under our statute to murder in the second degree, although it is essential to murder in the first degree." Judge Dillon, in delivering the opinion of the court in that case said: "Suppose I shoot at a person or strike at him, with the specific intention to maim him, or do him great bodily injury, but the unlawful shot or blow, instead of accomplishing or effecting my purpose, goes beyond it, or beside it, and takes his life. Unless there are some justifying, or mitigating circumstances, I am guilty of murder; but it is murder in the second degree, and I am thus guilty though there was no intention on my part to take life."

Thus it is clear that the want of an actual intent to take life, and preparation therefor by previous possession of the weapon, on the prisoner's part, cannot affect the verdict of second degree murder, and even if there be no evidence in the case, upon which a verdict of murder in the first degree might have been predicated by the jury, no harm has resulted to the accused from the giving of the instruction expounding that proposition of law. But, was it not a question for the jury to say whether under all the circumstances of the case, the accused did the act with intent to take the life of the deceased? If, at the time he seized the stick with which he immediately afterward delivered the blow, he conceived the design to kill the deceased, it was enough to raise the offense to first degree murder. "To constitute wilful, deliberate and premeditated killing, constituting murder in the first degree, it is not necessary that the intention to kill should

exist for any particular length of time prior to the actual killing; it is only necessary that said intention should come into existence for the first time, at the time of such killing, or any time previously." *Wright's Case,* 33 Grat. 880; 75 Va. 914. "The question whether a particular homicide is murder in the first or second degree is one of fact for the jury." *Welch's Case,* 36 W. Va. 690.

The next exception insisted upon is as to instruction No. 3 given for the State expounding the law upon the theory of self-defense in the case. This exception is grounded upon the failure to add to the instruction, which is in the words of the 19th point of syllabus in the *Greer Case,* 22 W. Va. 800, that such defense may be fully sustained by the evidence for the State, or by all the circumstances in the case, as held in the *Mann's Case,* recently decided by this Court. The exception is not well taken, even if the evidence warranted any instruction at all on the theory of self-defense, because another instruction on that theory, embodying the law as laid down in the 6th point of the syllabus in the *Cain Case, supra,* was given, informing the jury that such defense might appear from all the evidence and circumstances of the case. "Where instructions given clearly and fairly lay down the law of the case, it is not error to refuse other instructions on the same subject." *State* v. *Bingham,* 42 W. Va. 234.

The exception to the giving of instruction No. 6 for the State is also insisted upon. This instruction is in the words of point 12 of the syllabus in the *Cain Case,* and the exception is based upon the grounds upon which it was resisted and held to be improper in *State* v. *Dickey,* 46 W. Va. 319, viz: that it assumes the existence of bare fear on the part of the prisoner unaccompanied by any overt act upon which fear was based. The two cases are widely different. In the *Dickey Case* there was proof of the prisoner having been knocked down by a rock thrown by his antagonist, and that when he struck deceased, he was stooping over as if to pick up another one. The court seems to have regarded these circumstances as concluding any theory in the case of the prisoner's having been actuated by bare fear. It cannot be said that such a theory is inconsistent with the facts of this case, and the exception is not well taken.

The court having given the jury as an instruction at the instance of the defendant the law as laid down in point seven of the syllabus in the *Cain Case,* the prisoner asked that his in-

struction No. 2, embodying point eight of said syllabus be given, but the court, instead of complying with his request, modified it by inserting the words "was himself without fault." The court committed no error in this action.

To make his act excusable under the circumstances stated in the instruction, the person must have been without fault. Point eight of said syllabus is prefaced by the words, "in such case," referring to the case stated in point seven in which the words "without fault himself" are used, and in substantially re-stating the case, it was not error to repeat that part of it.

Complaint is also made because the court refused to give prisoner instruction No. 4 which reads: "The court further instructs the jury that in determining the question of defendant's guilt or innocence in this case, it is the duty of the jury to weigh and consider all the evidence that has been introduced, establishing or tending to establish the good character of the defendant, as well as all the evidence tending to establish the quarrelsome, overbearing character and disposition of the deceased;" and in lieu thereof gave the following: "The court further instructs the jury that the law presumes the prisoner innocent, and that in determining the question of the defendant's guilt or innocence in this case it is the duty of the jury to consider and weigh all the evidence that has been introduced including that tending to establish the good character of the defendant." It is clear that there is nothing in the instruction given that could possibly prejudice the prisoner, and it would be difficult to assign any reason for error in giving it, but the one asked instead of it was properly refused. It is open to at least two fatal objections; first, it gives undue prominence to isolated portions of the evidence, and practically ignores all of the most vital evidence relating to every theory of the case. It is calculated to induce the jury to attach too much importance to the evidence relating to the characters of the accused and the deceased, and distract their attention from other important phases of the case. 11 Enc. Pl. & Pr. 185. It also seeks to apply the evidence of the bad character of the deceased to the general issue in the case, the guilt or innocence of the prisoner. That is improper. It has no such application; it is only applicable to, and can only be used in connection with, the issue of self-defense. Upon no other ground is such evidence admissible in a case of homicide. The bad character of the victim never excuses, justifies or extenuates the offense

of killing, except when in connection with other facts it makes out a case of self-defense. The defendant is never permitted to say of his victim, "I killed him because he was a bad man;" nor is he permitted to prove his bad character upon that theory. Whar. Hom. 2 Ed. ss. 605-6. Evidence of the good character of the prisoner is always admissible in such cases to disprove guilt, and of his pacific character, to aid the jury in ascertaining the probable grade of the offense. *Id.* s. 592.

The prisoner is entitled, then, to have every fact in the case considered by the jury, in the light of his good character if he can establish it, but not in connection with the bad character of the deceased. Said instruction No. 4 was therefore properly refused, because it was calculated to mislead the jury and did not correctly state the law. The prisoner having requested an improper instruction from the court upon the general issue of his guilt or innocence, he cannot be heard to complain because the court gave, in lieu of it, a proper one on that issue.

Instruction No. 6 asked by the prisoner informed the jury that the law presumed the innocence of the prisoner, and if from all the facts, circumstances and evidence in the case the jury had a reasonable doubt of the defendant's guilt, they should find him not guilty; and No. 7 was to the effect that if any member of the jury should from such fact, etc., entertain a reasonable doubt as to the prisoner's guilt he cannot be convicted. The court refused to give these two instructions, but combined them into one, and gave it. All that was asked in the two instructions was given the prisoner in the one, and he was not prejudiced by the action of the court, and said exception is not well taken.

Instructions Nos. 3 and 5 asked by the prisoner and refused by the court were similar and to the general effect that if the jury believed from all the facts and circumstances of the case that the killing was neither intentional nor wilful, the prisoner could not be convicted of murder in either degree, but (in No. 5) they might find him guilty, if they believed from the evidence they would be justified in so doing, of involuntary manslaughter. From what has been said in connection with the first exception, concerning the nature of the crime of murder in the second degree, it is clear that both of these instructions were calculated to mislead the jury, mis-stated the law, and were properly refused; and also that the court did not err in overruling the mo-

tion to set aside the verdict-and grant a new trial and the motion in arrest of judgment.

For the reasons herein stated, there is no error in the judgment of the circuit court, and it is therefore affirmed.

*Affirmed.*