# CHARLESTON.

## STATE v. ANTHONY COOK.

Submitted May 22, 1923.   Decided May 29, 1923.

1. HOMICIDE—*Evidence Held Insufficient to Justify Instruction on Assumption of Threat by Deceased Against Accused.*

   Where in a trial for homicide it is sought to prove threats made by deceased against the slayer, and the witness says he heard the deceased "talk some, but I cannot make a true statement of it; I could not recognize it enough to give a positive statement as to when it was and all about it," and he does not undertake to say when or what it was that the deceased said; it is not error to refuse an instruction based on the assumption that a threat against the person or life of the defendant had in fact been made by the deceased against him.   (p. 171).

2. SAME—*Instruction on Self Defense Held Proper.*

   Where it appears there had been a quarrel of no serious character between defendant and deceased and they had separated, the former retiring into a dwelling house near the public road, and the latter pursuing his journey; but a short time thereafter the deceased and his son (the latter having heard of the quarrel) returned along the public road near the dwelling house; and defendant knowing of their presence, and being armed with a pistol left the dwelling against the advice and urging of those in the house, with the remark that "if they did not want to see a man killed they had better remain in the house," and proceeded to the public road where after a short altercation defendant shot and killed the deceased; and in justification pleads self defense; it is not error to instruct the jury that if they believe there was a quarrel between the prisoner and deceased and that both were

at fault, and a combat as a result of such quarrel took place, and that in such combat the prisoner inflicted upon the deceased a mortal wound, in order to excuse the killing on the ground of self defense two things must appear from the evidence or circumstances in the case; "first, that before the mortal wound was inflicted the prisoner declined further combat and retreated as far as he could with safety; and second, that he necessarily killed the deceased in order to preserve his own life, or to protect himself from great bodily harm." (p. 173).

3. CRIMINAL LAW—*Not Erroneous to Refuse Instructions, the Substance of Which was Already Covered in Given Instructions.*

   It is not error to refuse instructions on "reasonable doubt" the substance of which has already been given in other instructions. (p. 176).

4. SAME—*Hearing Application of Juror to Carry Revolver During Criminal Trial Held not Prejudicial; No Inference of Prejudice Arises Where one of Counsel for Prosecution Appears for Juror in Application for License, Hearing of Which was had Pending Trial.*

   It is not error for the court during a lull in the trial of a criminal case to act upon an application of one of the jurors to carry a revolver, notice of which has been duly published according to the statute and fixed for hearing on that day, the granting of the license having no relevancy or connection whatever with the trial. And no inference of prejudice against the prisoner arises because one of the lawyers engaged in the prosecution appeared as counsel for the juror in his application for the license. (p. 176).

Error to Circuit Court, Boone County.

Antony Cook was convicted of murder in the second degree, and he brings error.

*Affirmed.*

*L. Fulton* and *B. J. Pettigrew,* for plaintiff in error.

*E. T. England,* Attorney General and *R. A. Blessing,* Assistant Attorney General, for the State.

LIVELY, JUDGE:

This writ is to review a sentence of fifteen years confinement in the penitentiary based upon a verdict of murder

in the second degree. The tragedy occurred about 4 o'clock Sunday afternoon on December 11, 1921, in the public road in front of the dwelling of Blaine Cook, a cousin of defendant. A short time before the fatal affray defendant, Blaine Cook his cousin, and Emma the wife of the latter, and a Miss Mooney, a daughter of Blaine Cook's wife, were at the dwelling when deceased came by and engaged in a friendly conversation with Blaine Cook and defendant. It seems that some time prior some of the stock of deceased had been killed, and he suspected a Linville boy who usually made his home with defendant, and said something relative to the Linville boy which reflected upon defendant; a quarrel ensued, not of a serious character, and some boy leaving the place of the altercation informed those he met that trouble was in progress between defendant and deceased. This news reached Minsco Webb, a son of deceased, who was at his father's house about a quarter of a mile from Blaine Cook's, and he immediately and hurriedly went to the scene of the reported trouble followed in a few minutes by his wife and Ruby Webb, the former bringing a pistol. Minsco came to Blaine Cook's house and saw no one there. The wordy difficulty had ceased. He was looking for his father, and discovered him some distance beyond at a bridge over Matts Creek, and after talking with him a few moments returned toward Blaine Cook's house followed by his father. At that time defendant, Blaine Cook and his wife and Muriel Mooney were in the house, and they had been apprised by some of the children that Minsco Webb had passed the house seemingly in a hurry. Defendant indicated an intention of going out, and the three persons with him insisted that he remain. Blaine Cook saying that one man did not have a chance against two. Defendant replied that if they did not have the nerve to see a man die they had better not come out. He was armed with a revolver which he carried in a holster under his overalls. He went out to the road where an altercation ensued between him and Minsco Webb, the deceased approaching at the time and remarking that they should have no difficulty over him, that he was able to take care of his own troubles. The fatal

shooting speedily followed. As usual, there is much conflict. in the testimony as to the actions of the immediate actors. Minsco says that defendant drew his revolver from beneath his overalls and fired one shot at him, the powder from which burned his person, and immediately turned the pistol and fired two shots in quick succession at his father who was about five or six steps away. He immediately grappled with defendant and prevented further use of the pistol, throwing him to the ground in the effort to secure the weapon. His father, the deceased, then came up, and struck defendant with his fist in the face. Blaine Cook came and secured the revolver after much effort and threw it beyond the reach of the combatants, where it was taken by Muriel Mooney, who extracted the cartridges therefrom, three of which had been fired, and hid it in the dirt somewhere above the house. Immediately after Blaine had secured the revolver the deceased fell on his face in the mud, having remarked before that time that he was shot. In a short time thereafter he died. One bullet had entered under and back of his right arm. Defendant says that both Minsco and deceased advanced upon him in a threatening manner, Minsco with a revolver in his hand, and deceased with a rock in his hand which he threw violently at defendant, striking him in the face and inflicting a wound from which the blood flowed; that just before or about the time he was hit he fired his revolver at deceased; the blow from the rock rendered him unconscious and he did not remember of having fired more than once, and when he came to his senses he was struggling with Minsco Webb on the ground. He says he fired the shot in defense of his life and that he had reason to believe and did believe he was in danger of death or great bodily harm from the impending assault. Blaine Cook saw the affray and in the main corroborates Minsco Webb. He says he saw nothing in the hand of deceased nor any offensive weapon in the hands of Minsco; that if there had been he would have seen it; that when defendant began shooting he turned his head, and when he looked again Minsco had grappled with defendant and they went to the ground and deceased came up and struck defendant with his

fist while he was on the ground; that after some difficulty he succeeded in securing the revolver from defendant, and threw it to the Mooney girl, with instructions to take it out of reach; that immediately after he separated Minsco and defendant, Lewis Webb, the deceased, fell on his face, and soon afterwards expired. There are other witnesses who were not so near who claim to have seen the difficulty, namely, Minsco's wife, Ruby Webb his sister, both arriving on the scene while the scuffle was in progress on the ground; two of defendant's boys, who were near by, and a Mrs. McNeely. The testimohy of these witnesses is in conflict, those testifying for the state corroborating in the main the evidence of Minsco and Blaine; and those for defendant corroborating his statements. Some of the witnesses for the defense say they saw Minsco's wife take off of his person a revolver while the scuffle was in progress on the ground, while she says the revolver which she brought with her was never out of her possession. Immediately after the combatants were separated defendant went into the house where after washing his face, he remained a few moments, and according to one of the women in the house, asked if Lewis Webb was yet dead, then went out the back way and disappeared in the nearby woods, claiming on the trial that he was afraid Minsco Webb would shoot him.

The conflict in the evidence as to which was the aggressor has been solved by the jury in favor of the State. The theory of self defense has been repudiated by their verdict. They have come to the conclusion that the fatal shot was fired in the heat of blood without justifiable provocation, and with malice. From the use of a deadly weapon malice could be inferred, and we find there was evidence of threats against the life of deceased which would justify the jury in raising the offense to murder in the second degree. It would serve no useful purpose to comment upon the conflict in the evidence regarding the affray. Two or three facts stand out with prominence. Defendant was urged not to leave the house and go out to the Webbs in the public road. He admits that he was so advised, and admits saying something to the effect that if those in the house "didn't have nerve to

see a man die they had better stay in the house.'' Another
fact is that the deceased was shot under and back of his right
arm, and that Minsco Webb did not use a revolver if he had
one, as testified by some of the witnesses for defense. He had
ample opportunity and provocation for its use.

The assignments of error are: (1) admission of improper
evidence to the jury; (2) instructions to the jury; and (3)
granting to one of the jurors a license to carry a revolver,
during the progress of the trial, the applicant being repre-
sented by the law firm of Leftwich and Shaffer, who appeared
as assistants to the prosecuting attorney in the prosecution.

As to the admission of testimony, claimed to be erroneous:
Roscoe Cook, a witness for the state, testified that about two
years before the fatal shooting he had a conversation with
defendant at his home, which was in view of the home of
deceased, concerning a quarrel or fight which a Linville boy
had with one of the boys of defendant, and that defendant
said on that occasion that he had his winchester lying on his
gate sighting off of his gate at Lewis Webb's gate, and he
said if any one of them had come out he intended to shoot
them. In further examination of this witness it developed
that the threat, if it could be so named, was not against the
deceased and was evidently with reference to one of the Lin-
ville boys ,who was then at Lewis Webb's residence; and when
this developed in the testimony the court directed that the
entire conversation should be stricken out and that the jury
should not regard it in arriving at their verdict. It is argued
that while the court instructed the jury to disregard the con-
versation related by the witness he did not tell the jury to
disregard the evidence of the alleged threat made by the
defendant. We do not so interpret the court's ruling. The
judge told the jury expressly that they should disregard the
statement made by the witness in arriving at their verdict.
The jury could not have been misled as to the import and
meaning of the court's instruction.

Malinda Cook, the wife of Burton Cook, a first cousin of
defendant, testified that possibly six or seven months before
the fatal shooting defendant told her and her husband that

he was going to kill Lewis Webb and "to listen out for it;" that on several different occasions he told her practically the same thing, but gave no reason for it. This is argued to be erroneous because the alleged threat is nowise connected with the homicide. We do not see the force of this argument. It was a direct threat and was admissible for showing the state of mind of defendant toward the deceased. It is true that it was some months before, but not at such a remote time that its probative value would be lost.

Another witness, Carl Linville, testified that in a conversation with defendant about three weeks or a month before the shooting defendant had told him that Lewis Webb had been meddling with him where he had no business, and that the first time he caught him at it was going to kill him. Burton Cook says he did not hear defendant make the threats against deceased, testified to by his wife; on the contrary it was sought to be shown by this witness that deceased had made threats against defendant. He was asked the question if he had ever heard Lewis Webb make threats against Anthony Cook, and he replied: "Well, I have heard him talk some, but I cannot make a true statement of it. I could not recognize it enough to give a positive statement as to when it was and all about it." He said he afterwards told defendant about the conversation with the deceased; and defendant testified that Burton Cook had told him what deceased had said. What and when the conversation was does not appear. Whether it was a threat against the person, property or business of defendant cannot be determined; it was too vague both in substance and time. It had no probative value.

Upon this evidence defendant offered instruction No. 6 which told the jury if they believed that deceased made threats against defendant prior to the shooting, which were communicated to him, the jury should consider such threats in determining whether the prisoner had, at the time of the shooting, reasonable grounds to apprehend that deceased intended to cause him some bodily injury at the time of the shooting. Was there anything in the evidence detailed by Burton Cook which the jury could consider as a threat

against the person of defendant? "It is very old law that an instruction should not be given without evidence bearing upon the facts on which it rests, and whether there is such evidence the court must say." *Rowan* v. *Hull*, 55 W. Va. 335. There was no error in refusing this instruction, nor of defendant's instruction No. 9; which is also based on the assumption of threats of violence made toward the person of defendant, by deceased, as detailed by Burton Cook.

State's instruction No. 5, is criticised as applicable to this case, and is claimed to be erroneous in that it does not properly propound the law of self defense. It is as follows: "The court instructs the jury that before the prisoner can avail himself of the law of self defense it must appear that he was without fault in bringing on the difficulty, or, being at fault, he must have retreated as far as he could with safety before he would be justified in inflicting a mortal wound, and if it appears from the evidence in the case that there was a quarrel between the prisoner and the deceased and that both were at fault and a combat as a result of such quarrel took place and that in such combat the prisoner inflicted upon the deceased a mortal wound from which death ensued, in order to excuse the killing on the ground of self defense two things must appear from the evidence or circumstances in the case: First, that before the mortal wound was inflicted the prisoner declined further combat and retreated as far as he could with safety; and, Second, that he necessarily killed the deceased in order to preserve his own life, or to protect himself from great bodily harm." The criticism is directed to the last paragraph of the instruction, which is, "and, Second, that he necessarily killed the deceased in order to preserve his own life, or to protect himself from great bodily harm." It is asserted that this places too great a burden upon the defendant; that even where he is at fault in bringing on the affray, yet where he declines the combat and retreats to the wall, or as far as safety will permit, he has purged himself of his fault and from that time stands in a different relation to his assailant, and that he may then act as if he had been attacked without fault on his part, and if he

has reasonable grounds to believe and does believe that the danger is imminent he may act upon the appearance of danger and kill his assailant if he has reasonable grounds to believe and does believe that such killing is necessary in order to avoid the apparent danger.   In other words, after he has in good faith declined to combat and retreats as far as he can with safety, then he is placed in the position of one who has been attacked without fault, and is governed by the law applicable to one without fault.   There is force in this reasoning; and if the proposition was one of first impression that reasoning might be followed; but the decisions seem to make a distinction and cast a greater burden upon the defendant where he has committed homicide on the plea of self defense when he has begun the affray originally or was at fault in bringing it about, than in the case where he has been attacked and is without fault.   This part of the instruction is in the language of the 6th point of the syllabus in *Cain's Case,* 20 W. Va. 679, which says: ''Where there is a quarrel between two persons, and both are in fault, and a combat as the result of such quarrel takes place, and death ensues, in order to reduce the offense to killing in self defense, two things must appear from the evidence and the circumstances of the case, first that before the mortal blow was given, the prisoner declined further combat and retreated, as far as he could with safety; and secondly, that he necessarily killed the deceased in order to preserve his own life, or to protect himself from great bodily harm.''   This point of the syllabus in *Cain's Case* was approved in *State* v. *Evans,* 33 W. Va. 421, and *State* v. *Kohne,* 48 W. Va. 337; and referred to with apparent approval in *State* v. *Greer,* 22 W. Va. 817; *State* v. *Morrison,* 49 W. Va. 217; *State* v. *Ballard,* 55 W. Va. 383; *State* v. *Banks,* 55 W. Va. 390; and *State* v. *Taylor,* 57 W. Va. 242.   The distinction in the exercise of self defense between the two instances, namely, where one without fault is attacked, and where one is at fault in bringing on the necessity for the killing, is sharply drawn.   Our cases do not give the reasons why a greater burden is placed upon the one who is at fault and who retreats and then at

the wall turns and kills his adversary.  They simply state
the distinction, and lay down the rule that the one at fault
must not only retreat as far as he can with safety in good
faith, but that it must appear that he necessarily killed his
adversary in order to preserve his own life or to protect him-
self from great bodily harm. . They do not state that by his
retreating he has thereby purged himself of all fault and
gained the status of one who has been attacked without fault..
Generally, if the defendant in any way challenged the fight
and went to it armed, he cannot afterward maintain that in
taking his assailant's life he acted in self defense.  1. Whar.
Crim. Law, sec. 617, and cases cited from all the States.
"There is certainly no law to justify the proposition that a
man may be the assailant and bring on an attack, and then
claim exemption from the consequence of killing his adver-
sary on the ground of self defense.  While a man may act
safely on appearances and is not bound to wait until a blow
is received, yet he cannot be the aggressor and then shield
himself on the assumption that he was defending himself."
*State* v. *Linney*, 52 Mo. 40.  So it seems that where a person
is at fault in bringing about the affray he must not only re-
treat as far as safety will permit and in good faith decline
the combat, and if followed by his adversary, he cannot then
kill him unless it be necessary to protect his own life or him-
self from great bodily harm.  Juries, unless swayed by
passion, prejudice or ulterior motives, usually reach the very
right of a case fairly presented and are not swayed by fine
technical distinctions contained in the instructions.  We do
not feel constrained to change the rule of self defense laid
down in the 6th point of the syllabus in *Cain's Case.*

Defendant was armed with a revolver which he carried in
a holster under his overalls, and instruction No. 8, refused,
was for the purpose of telling the jury that they should not
draw any unfavorable inference against defendant on that
account, if they believed he was carrying the same in good
faith to protect himself against violence and in good faith
believed that it was necessary to arm himself for that purpose.
There is no evidence that he had armed himself in good faith

for his protection against violence. His explanation of carry-
ing the revolver is that he sometimes carried it when he
thought there was "danger of drinking around or something
of that sort." This explanation would not justify him in
violating the law against carrying a revolver. If he desired
in good faith to protect himself by the use of a revolver he
could have obtained the right to carry it by making due ap-
plication and showing that he was a fit person, and had a
sufficient reason therefor. While there could be no inference
of malice against the defendant or any particular person by
reason of his having the revolver, it would not give him a
right to carry the weapon as set out in the instruction, and
the jury could make any reasonable inference from his ad-
mitted habit of carrying the weapon in violation of law.
We do not think it was error to refuse the instruction under
the evidence and circumstances in this particular case.

Defendant's instructions Nos. 3 and 4 were refused. They
would have told the jury that they must believe defendant
guilty beyond all reasonable doubt before they could con-
vict; and if they entertained any reasonable doubt as to de-
fendant's guilt they should acquit him. The substance of
these instructions was incorporated in defendant's instruc-
tion No. 2 and in state's instruction No. 7. Instructions should
not be repeated, although the verbiage used is different.
*State* v. *Legg*, 59 W. Va. 328. JUDGE SANDERS in the Legg
case said: "Four long instructions on reasonable doubt which
has never yet been defined or made clearer than the words
import can certainly be of no service to a jury."

The last assignment of error is that the court permitted
one of the jurors serving on the panel to receive a license
to carry a pistol upon his application therefor, duly adver-
tised and set for that day. When there was a lull in the trial
of the case the formality of examining the juror upon his
application and granting the right prayed for thereunder
was heard and determined by the court. It had no relevancy
or bearing whatever upon the issues involved, and we cannot
see wherein it would prejudice the prisoner in any conceiv-
able way. It is suggested by counsel for defendant that be-

cause the firm of lawyers, a member of which was assisting in the prosecution, appeared for the juror who made the application and assisted him in procuring the license, was prejudicial to defendant. On what theory that inference could be drawn is not at all clear. It would have no more relevancy to the trial nor affect the result any more than if the attorney acting as counsel for one of the jurors in some civil matter concerning the transfer of realty, had procured his signature and acknowledgment to a deed during the lull in the trial. We think there is no merit whatever in this assignment of error.

The judgment is affirmed.

*Affirmed.*